Gilbert AVILA, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–95–00289–CR.

Court of Appeals of Texas,
El Paso.

Aug. 28, 1997.

Rehearing Overruled Nov. 12, 1997.

Charles Louis Roberts, Lauren K.S. Murdoch, El Paso, for Appellant.

Jaime E. Esparza, District Attorney, El Paso, for State.

Before BARAJAS, C.J., and McCLURE and CHEW, JJ.

## OPINION

McCLURE, Justice.

This is an appeal from a conviction for the offense of murder. A jury found Appellant guilty in the slaying of his wife, sentenced him to 61 years' confinement in the Texas Department of Criminal Justice, Institutional Division, and assessed a fine of $10,000.

## SUMMARY OF THE EVIDENCE

Appellant and his wife, Jacqueline, lived with their young daughter, Appellant's parents, and Appellant's sister. The testimony of Appellant and his father, Juan Avila, differed considerably concerning the events leading up to the murder. Both testified that Appellant and Jacqueline had a number of disagreements, some of which stemmed from changes that had occurred as a result of Jacqueline becoming a policewoman. Appellant is a deputy reserve sheriff. He and Jacqueline had each taken the examination to enter the El Paso Police Academy, but only Jacqueline had passed the test. Jacqueline graduated from the Academy some three or four months before her death. Appellant testified that he had encouraged his wife to become a police officer, but that after she joined the force, she became aloof and never spent any time at home. He asked her to leave the department in order to save their marriage, but she told him she would rather leave him and their daughter. By contrast, Juan stated that Appellant was jealous of his wife's success and this jealousy motivated his desire for Jacqueline to quit her job. He also testified that his son was hot-tempered and became violent when angered. Jacqueline was not a violent person by nature, and Appellant was the more aggressive of the two.

Appellant and his father also offered different versions of the events on the night of the murder. Juan testified that his son came home around 10:30 p.m.; Jacqueline came in between 11:30 p.m. and midnight. Juan testified that his wife woke him between midnight and 1 a.m., saying that she heard Appellant and Jacqueline arguing. Juan thought he heard Appellant strike his wife,

and he went to their bedroom. He found Appellant and Jacqueline arguing about her leaving the police department. He heard Jacqueline tell Appellant that she was tired of his abuse and that she was going to leave him. Appellant threatened her at that point, although the specifics of the threat are not clear from the record. Juan watched as Jacqueline moved to Jennifer's bedroom [1], and he noticed that she was not carrying anything with her. Appellant stayed in the couple's bedroom with their daughter. Juan remarked that both Appellant and Jacqueline kept their duty guns in gun cases in their bedroom closet, and he believed that the guns stayed in the closet after Jacqueline went to Jennifer's room.

Around thirty minutes later, Juan heard another argument between Appellant and Jacqueline, then gunshots, this time from Jennifer's bedroom. Juan forced open the door and saw Appellant standing next to the bed with a dark-colored pistol in his hand; Jacqueline was lying quite still on the bed. Juan testified that when he first came upon the scene, Appellant was not injured in any way. Juan stepped out of the room and into the hallway because Appellant still had the gun in his hand and Juan was afraid of him. A few minutes later, he heard more shots. When he went back inside, he found that Jacqueline was still not moving, but this time Appellant had been shot. Juan told his son to put the gun down; Appellant complied by putting the gun on the dresser. Juan identified a black-colored pistol as the one Appellant held in his hand; he did not see a silver-colored gun. Juan told his wife to call 911.

Appellant testified that on the night of the shooting, his wife had come home late from work in a bad mood. She had snapped at Appellant for not eating the food she had brought home, said she wanted a divorce, and said that a silent message on the telephone answering machine must have been a woman with whom Appellant was having an affair. After an argument centering around these comments, Jacqueline had violently refused his sexual overtures and had moved to Jennifer's bedroom to sleep alone. Appellant put his daughter to bed, then went to the

---

1. Jennifer is Appellant's sister, who happened to   be spending the night with a friend.

other bedroom. Jacqueline told him that she was going to leave him because of his infidelity. He responded that she was probably the one having the affair, that he would file for divorce, and that he would take their daughter away from her. As soon as he said that, Jacqueline tried to kick him, and he saw a gun fall on the floor. He then saw that Jacqueline was holding her gun in her right hand and pointing it in his direction; Appellant grabbed the gun on the floor and began shooting. When he saw what he had done, he turned his gun on himself and fired, then hugged his wife and kissed her. Appellant testified that his actions on the night he killed his wife represented self-defense.

The 911 operator received the call at approximately 2:49 a.m. Officer Rogelio Flores responded to the initial call. Appellant told him that he and his wife had "shot each other." Jacqueline's weapon was found on top of her right hand with blood on it. Barbara Elizalde, a serologist from the Department of Public Safety laboratory, testified that blood taken from the left arm and wrist of the deceased matched that of Appellant.

Officer Jimmy Aguirre also responded to the initial call. He testified that Jacqueline had been dead long before the police arrived, and that a silver Smith & Wesson stainless steel 9 mm pistol was resting on top of her left hand, rather than her right hand, as Officer Flores had testified. Officer Aguirre found the placement of the silver pistol to be very awkward.

Identification and Records Section Police Officer McGill performed an atomic absorption test on the hands of the deceased, and one of her hands revealed a positive test. These test results could mean either that (1) she fired a weapon; (2) she was in close proximity to a discharged weapon; or (3) that a weapon that had been discharged had touched her, depositing gunshot residue. Six brass cartridges from Appellant's gun and one silver casing from the gun allegedly fired by Jacqueline were recovered at the scene. Jacqueline's wounds were inflicted from up to seven feet away. Firearms examiners could not determine that the silver shell came from her gun.

Appellant's sole wound was found in his back. The one bullet hole in his t-shirt showed gunpowder residue indicating that the muzzle of the weapon was in contact with the t-shirt at the time the wound was inflicted.

Appellant raises five points of error on appeal. First, he argues that the trial court erred by excluding the expert testimony of Luiz Natalicio, Ph.D., which suggested that Appellant fired the pistol at his wife involuntarily, as a reflex action. In his next four points, he contends that the trial court committed charge error by refusing to submit the lesser-included offenses of involuntary manslaughter and criminally negligent homicide in violation of both the federal and state constitutions. We address each in turn.

## INAPPLICABILITY OF DeGARMO DOCTRINE

The State initially raises a general claim that all of Appellant's points of error are waived because of his alleged confession during the punishment phase of trial. The State cites the emboldened passage in the following colloquy to support its argument that the *DeGarmo* doctrine applies:

Direct Examination by Defense Counsel:

Q: And, Mr. Avila, you are the same Gilbert Avila that has been convicted by this jury for the offense of murder?

A: Yes, sir.

Q: Do you accept the jury's verdict, sir? As hard as it is, Mr. Avila, my question to you is: You've heard their verdict. Do you accept their verdict?

A: Yes, sir.

. . .

Cross-Examination by the State:

Q: You said you accepted the jury's verdict. You know what you mean when you say—tell me what you mean when you say that.

A: That I was guilty of what happened July 16th. [Emphasis added.]

Q: That it wasn't true that you acted in self-defense on July 16, 1993, is that what you're telling us here today?

Q: (By Defense Counsel) I'm going to object as to argumentative, Your Honor. He said he already accepted the verdict. The rest is argumentative.

A: (Trial Court) Overruled.

Q: Is that what you're telling the jury today, that on July 16, 1993 you did not act in self-defense?

A: I did acted [sic] in self-defense.

Q: So in the indictment, it says that you did then and there unlawfully, intentionally, and knowingly cause the death of Jacqueline Avila. Are you guilty of that?

A: In the eyes of the jury, yes.

Q: In your eyes—

Q: (By Defense Counsel): Your Honor, I don't see where that is relevant as to what he thinks. It's what the jury thinks that counts here. That's been established. The question is repetitive.

A: (Trial Court) Overruled.

A: (By Witness) I don't understand your question, sir.

Q: Well, you believe you acted in self-defense; true?

A: Yes.

Q: The jury says that you killed Jacqueline Avila by shooting her. You don't agree with that do you? 'Yes' or 'no.'

A: No.

Q: When they said on July 16, 1993 that you committed an act clearly dangerous to human life and that you killed Jacqueline Avila with a firearm by shooting her, you say that's not true; right?

A: No.

Q: So you did knowingly and intentionally cause the death of Jacqueline Avila?

A: No.

. . .

Q: And would it be fair to say that on July 16, 1993 you used State's Exhibit 15, this instrument of death, to kill Jacqueline Avila?

A: Yes.

The State maintains that Appellant admitted guilt and has therefore waived all non-jurisdictional error that may have occurred at the guilt-innocence stage of trial. The State correctly points out that if a defendant testifies at the punishment stage of the trial, and makes a clear judicial confession to the crime for which he has been found guilty, he has for legal purposes, entered the equivalent of a plea of guilty. *DeGarmo v. State,* 691 S.W.2d 657, 661 (Tex.Crim.App.), *cert denied,* 474 U.S. 973, 106 S.Ct. 337, 88 L.Ed.2d 322 (1985).

In *McGlothlin v. State,* 896 S.W.2d 183, 188 (Tex.Crim.App.1995), the Court of Criminal Appeals reiterated that a judicial confession of the charged offense at punishment waives all error which occurs during the guilt phase of trial. The Court instructed that judicial confessions at the punishment phase must be viewed in the context of the basic purpose of a trial, which is the determination of truth. *McGlothlin,* 896 S.W.2d at 187. "When the defendant testifies and judicially confesses to the charged offense, the purpose of the trial process has been served—the truth has been determined and the purpose of the guilt/innocence phase of the trial has been satisfied. No reversible error should occur where the defendant has satisfied the necessity of the trial process." *Id.* However, the reviewing court should carefully examine the elements of the offense to ensure that the defendant's statements actually constitute a judicial admission of the offense charged. *Id.* at 188. The Court emphasized that the holding was not intended to conflict with *Smyth v. State,* 634 S.W.2d 721 (Tex.Crim. App.1982).

In *Smyth,* the defendant was accused of possession of a usable quantity of marijuana. The State contended that the defendant had made a judicial confession that waived the unlawful seizure of evidence by the police. In her testimony, the defendant acknowledged that marijuana was in her car, but gave no indication whatsoever that the marijuana was of a usable quantity. As a result, the Court of Criminal Appeals concluded that she had not confessed all the elements comprising possession of the offense, specifically, possession of a usable quantity. Because the

defendant did not confess to a usable quantity, the only source of evidence establishing this element was the testimony of the police officer who conducted the illegal search. *Smyth*, 634 S.W.2d at 724.

In *McGlothlin*, the Court of Criminal Appeals harmonized its holding with *Smyth*, explaining that McGlothlin's testimony constituted a clear judicial admission to all the elements of the offense at issue, statutory rape. To the inquiry "you did, in fact, have sexual intercourse with this young lady?", McGlothlin responded, "Yes, sir." *McGlothlin*, 896 S.W.2d at 188. By acknowledging the specific fact that he had sexual intercourse with a minor, the defendant confessed to the necessary elements of the offense. No explicit confession to a mental state was necessary given the nature of the offense.

Although the scope of the *DeGarmo* doctrine is the subject of some controversy, some courts have encountered the type of confession contemplated by *McGlothlin*: clear and intentional confessions, in factual detail, to the elements of the crimes committed. *See Deleon v. State*, 925 S.W.2d 295, 296 (Tex.App.—Houston [1st Dist.] 1996, no pet.)(appellant testified in detail about the offense, admitting his guilt and insisting his wife was not guilty); and *Post v. State*, 936 S.W.2d 343, 349 (Tex.App.—Fort Worth 1996, no pet.)(aggravated robbery defendant admitted that he committed four specific robberies and that he used a knife in each of them).

Further, the language in *McGlothlin* that a confession was *intended* and *given* underscores the proposition that the *DeGarmo* doctrine is not intended to degenerate into chicanery, in which the prosecution seeks to elicit "magic words" from the defendant. Rather, clear confessions of the elements of the charged offense are to serve the same function that any judicial confession should serve—to determine the truth. *McGlothlin*, 896 S.W.2d at 187.

■ Here, the State's application of the *DeGarmo* doctrine runs afoul of the requirements articulated in *McGlothlin* in two respects. First, Appellant did not confess all the elements of the offense charged. As a result, his testimony resembles the in-court

statement of the defendant in *Smyth*. Second, when viewed in context, the Appellant's statement fails to reveal that Appellant intended to make an admission of the offense charged. We conclude that a judicial confession was neither intended nor given.

### Failure to Confess All Elements of the Offense

At guilt-innocence, Appellant did not deny that he had shot his wife. Rather, he sought to exculpate himself by suggesting that he did not possess the requisite mental state for the offense of murder. At the punishment phase, Appellant acknowledged that he "was guilty of what happened July 16th," a statement that is consistent with his defensive theory. He repeatedly denied that he "knowingly and intentionally caused the death of his wife" and consistently characterized his behavior as self-defense. A critical element of the offense is completely absent. We conclude that the *DeGarmo* doctrine cannot be applied unless the elements of the offense are clearly encompassed in the confession. *See also Travis v. State*, 921 S.W.2d 559, 563 (Tex.App.—Beaumont 1996, no pet.)(capital murder defendant did not waive error at punishment phase by admission that he killed his parents, where his defenses centered on showing less culpable mental state that corresponded to voluntary manslaughter). This is particularly true where the requisite intent is in issue.

### Lack of Intent

*McGlothlin* instructs us that in order for a defendant's statement to constitute a judicial confession that waives error at the guilt phase, the statement must reveal the clear intention to confess the crime. Where the State claims that an equivocal statement constitutes a judicial confession, *McGlothlin* requires us to examine the testimony in context to determine if the defendant really intended to confess the elements of the offense. Here, the statement claimed by the State to be a confession is equivocal because it scrupulously omits any mention of the mental state of the defendant at the time of the offense: I am "guilty of what happened July 16th." We

cannot conclude from an examination of the defendant's testimony that this statement was intended as a confession to the offense charged. Appellant repeatedly stated that he shot his wife in self-defense, and that he did not "intentionally and knowingly" murder her. We thus address the merits of the appeal.

## EXCLUSION OF EXPERT TESTIMONY

In his first point of error, Appellant urges that the trial court erred by excluding the expert testimony of Dr. Luiz Natalicio that Appellant fired the pistol involuntarily, as a reflex action, when he allegedly perceived that his wife was threatening him with her own pistol. Appellant characterizes Dr. Natalicio's testimony as "the keystone" of his defense, as this testimony provided critical support to his position that he did not voluntarily commit the murder.

### Factual Background

In order to address this point of error, we first consider the testimony pertinent to Appellant's theory concerning his mental state. Initially, we note that Appellant does not deny shooting his wife. He testified that when he saw the victim point her gun at him, he picked his gun up off the floor, pointed it at her, and started firing. Appellant focuses his entire defense on the premise that the shooting was accidental and/or in self-defense.

Deputy Sheriff Larry David Akin Jr., the Training Director for the El Paso County Sheriff's Department Training Academy, testified concerning Appellant's firearms training. Akin identified the gun that Appellant fired at the shooting range and confirmed that the weapon introduced in court was the same make and model as the gun Appellant used to qualify as a reserve sheriff. As a sheriff reservist, he could only carry his gun when he was on duty. Appellant had completed the 171–hour basic training course in early 1992. He had also attended some advanced training courses in July 1993, shortly before the murder. Akin testified that a student at the sheriff's academy is trained to distinguish targets quickly, to identify targets, to distinguish a threat

from a non-threat, to be able to execute good judgment, and to function well under stress. Akin explained that the sheriff's academy uses responsive or reflexive conditioning—repetitious training—to enable the student to respond to something subconsciously or without actually thinking about it: to react "involuntarily" based on a "stimulus." He testified that an officer who recognizes a threat to his life will respond automatically. However, he also testified that Appellant had completed 171 hours of total training, and that none of those courses taught officers "not to think." All the classes were designed to make officers think responsibly, and to evaluate a situation before reacting. Akin explained the extent to which an officer reacts "automatically":

> If someone strikes an officer in the face or attempts to strike him in the face, he's going to automatically try to redirect that blow based on training that he's received. An officer might draw his weapon automatically or reflectively based on some stimulus, but I don't think that officer will shoot his firearm or he won't strike the suspect or the subject he's dealing with without having a thought process involved in that. The actual execution, in other words, is going to involve a thought process.

Further, Akin explained that Appellant took a course called "Use of Force Options" in which he learned the conditions outlined in the Texas Penal Code concerning when one can justifiably use force, such as self-defense. Lastly, Akin commented that even in a friendly fire situation, the person shooting a weapon sees someone he thinks is the enemy and knowingly pulls a weapon, aims, and fires; the person shooting makes a decision to shoot even if he is mistaken.

Outside the presence of the jury, Appellant offered the testimony of Dr. Luiz Natalicio, a clinical psychologist in private practice after many years as a professor in the University of Texas system. He has worked in forensic psychology, evaluating whether people are competent to stand trial, and evaluating the psychological consequences of physical occurrences such as automobile accidents.

Dr. Natalicio's testimony regarding Appellant was in the field of "respondent," "reflex-

ive," or "classical" conditioning, all of which are synonymous. Natalicio specialized in this area of psychology in graduate school. He sought to apply principles of classical or reflexive conditioning to the facts of this case based on his exposure to law enforcement officers and their training. Law enforcement places officers in situations that require "speed, accuracy, and judgment or discrimination of aspects of the environment." Natalicio explained that an officer has to respond to a situation in a clear and precise way because often it involves or may involve the use of force.

Although Dr. Natalicio did not offer testimony concerning the precise methodology of instruction that Appellant received as a deputy reserve sheriff, he did speak generally concerning traditional weapons training. In the case of firearms, Natalicio testified that an officer is trained to ignore the irrelevant aspects of the environment and focus exclusively on relevant aspects "without second guessing." An officer using firearms must be trained not to allow unconditioned responses to stimuli, such as a startled reaction to a noise in the form of adrenaline and a change in heart rate, to disorient the officer and interfere with his accuracy in responding to the target. The officer must also be trained not to allow such unconditioned responses to prevent him from distinguishing friend and foe. At the shooting range, officers are trained, using panels that pop up suddenly, to shoot only the panels identifiable as the enemy. The officer is trained to react to the presence of a firearm and taught to respond immediately in the direction of the threat, reacting according to gradations of danger that the officer is trained to identify, such as a stone versus a knife versus a gun. The rush of adrenaline that occurs when one experiences threatening stimuli induces a "fight or flight" reaction. A person without training in firearms would choose "flight" over "fight." Classic or reflex conditioning increases a person's ability to fight.

Appellant asked Dr. Natalicio to respond to the following hypothetical. A husband and wife are both peace officers trained in law enforcement, including the use of firearms; both are aware of each other's abili-

ties; and the wife draws a gun on the husband. Given this scenario, Appellant inquired whether the husband's reaction to the risk posed by his wife would entail a "moral dilemma," or whether he would simply react according to his training. Dr. Natalicio responded that the husband's reaction to the threat would be "reflexive," "involuntary," and "instinctive." He acknowledged that the husband's reaction to the threat posed by his wife would involve "aspects of voluntary behavior," but insisted that the husband's response was "immediate," and that he would not have time to "think or evaluate" when confronted with a threat. Dr. Natalicio claimed that the husband would not have time to evaluate his relationship to the person posing the threat before he reacted, citing the example of "friendly fire" in the military or the secret service, in which soldiers or agents have killed one another unintentionally. He also cited the example of United States soldiers shooting children in Vietnam because of the perception that a child was carrying a bomb or a gun. Dr. Natalicio then stated that he had been meeting with Appellant regularly, and that Appellant suffered from post-traumatic stress reaction and major depression following the shooting of his wife. He offered his opinion concerning the shooting:

> It was an accident. He had just in the previous week been to training at the sheriff's academy, specifically involving advanced tactical offensive reactions, involving several hours, and given the circumstances at the time of this event, he responded in terms of the training he had been given up to that time. He had no intention of killing his wife. It was an accident. It was a reflex in response to a threatened stimulus.

The trial court sustained the State's objection that the expert testimony did not address any of the relevant issues in the case. The excluded testimony is before us on a proper bill of exceptions.

## STANDARD OF REVIEW

■ A trial court's decision to exclude evidence is subject to an abuse of discretion

standard on appeal. *Duckett v. State,* 797 S.W.2d 906, 910 (Tex.Crim.App.1990), *overruled on other grounds, Cohn v. State,* 849 S.W.2d 817 (Tex.Crim.App.1993). Even if the trial court's reason for its ruling is incorrect, the ruling will be upheld if it is permissible under any theory applicable to the case. *Romero v. State,* 800 S.W.2d 539, 543 (Tex. Crim.App.1990).

## EXPERT TESTIMONY

The admissibility of scientific expert testimony in a criminal trial is governed by TEX. R.CRIM.EVID. 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In *Jordan v. State,* 928 S.W.2d 550 (Tex.Crim.App.1996), the Texas Court of Criminal Appeals explained, consistent with *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *E.I. du Pont de Nemours and Company, Inc. v. Robinson,* 923 S.W.2d 549 (1995), that Rule 702 requires the trial judge to serve a "gatekeeper" function in requiring scientific testimony to be relevant and reliable. In order to be reliable, scientific testimony must be based on scientifically valid knowledge derived from scientific method. In particular, the courts seek to scrutinize proffered scientific evidence when it is based on novel scientific theories, or "junk science." *Jordan,* 928 S.W.2d at 555, *citing E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d at 554. In order to be relevant, scientific testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Jordan,* 928 S.W.2d at 555, *citing Daubert,* 509 U.S. at 589–93, 113 S.Ct. at 2795–96. The *Jordan* Court expressed relevance as the closeness of the "fit" between the scientific evidence and the fact in issue. *Id.* at 554.

Appellant maintained at oral argument that the expert testimony spoke to the issue of Appellant's mental state at the time of the offense. However, the substance of Appellant's argument, as well as the substance of the expert testimony itself, demonstrates that the expert testimony was actually intended to speak to two issues: the voluntariness of Appellant's actions, and his mental state at the time of the offense. Appellant's first point of error conflates the distinct issues of voluntariness on the one hand, and culpable mental states on the other. *See Adanandus v. State,* 866 S.W.2d 210, 229–30 (Tex.Crim.App.1993).

We find that the expert scientific testimony of Dr. Natalicio was offered on two different issues: first on the issue of voluntariness, and second on the issue of mental state at the time of the offense. We conclude that the trial court properly excluded the testimony because it was not relevant to the issue of voluntariness, and was not reliable on the issue of mental state.

### Voluntariness

Accident no longer constitutes a defense, but is incorporated within TEX.PENAL CODE ANN. § 6.01(a)(Vernon 1994) which provides: "A person commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession." In *Alford v. State,* 866 S.W.2d 619 (Tex.Crim.App. 1993), the Court of Criminal Appeals explained the meaning of the term "voluntarily." An act is performed "voluntarily" for purposes of the Penal Code if it is committed without accident, omission, or possession. *Alford,* 866 S.W.2d at 624. In this context, "voluntary" is essentially the antonym of "accident." In order to be considered voluntary, an act need not be the product of the defendant's free will. *Id.* at 622. *See also George v. State,* 681 S.W.2d 43 (Tex.Crim. App.1984).

The proffered testimony of Dr. Natalicio does not suggest that Appellant's bodily movements "were not controlled through his own efforts," as *Alford* described a non-voluntary act. Appellant did not testify that the gun accidentally discharged, or that he tripped and fell and the gun discharged, or that someone held his arm and forced him to squeeze the trigger. Both Appellant and Dr. Natalicio testified that Appellant perceived a

danger from his wife's actions, picked up a gun, aimed it at her, and fired a number of rounds. These were all actions within Appellant's control. Dr. Natalicio's testimony speaks to an issue that is not required to demonstrate the voluntariness of Appellant's actions: he sought to establish that the act of picking up the revolver and firing was not a volitional act, but resulted from Appellant's weapons training as a peace officer. Dr. Natalicio concluded that Appellant "had no intention of killing his wife. It was an accident. It was a reflex in response to a threatened stimulus." However, the expert's use of the term "intention," "accident," and "reflex response" all presuppose that a voluntary act must be volitional, an act of free will. What Dr. Natalicio characterizes as a "reflex in response to a threatened stimulus" constitutes a "voluntary" act for purposes of the Penal Code.

### Mental State

The State has asserted that Appellant did not offer the testimony of Dr. Natalicio on the issue of Appellant's mental state at the time of the killing. We disagree with this characterization of the record, since the conversation between the trial court, defense counsel, and prosecutor at trial concerning Dr. Natalicio's testimony centered on TEX. CODE CRIM.PROC.ANN. § 38.36 (Vernon Supp. 1997), formerly TEX.PENAL CODE § 19.06, *Winegarner v. State,* 505 S.W.2d 303, 305 (Tex.Crim.App.1974), and *Fielder v. State,* 756 S.W.2d 309 (Tex.Crim.App.1988), all of which pertain to the admissibility of testimony concerning the mental state of the defendant at the time a crime is committed. We agree with Appellant that the testimony was offered for this purpose. We next address whether it was error to exclude Dr. Natalicio's testimony with respect to Appellant's mental state at the time of the offense.

■ Texas courts have traditionally rejected the attempt to offer any testimony, other than that of the accused, concerning his mental state at the moment he committed the crime. Such testimony was considered speculative and unreliable. *Whitmire v. State,* 789 S.W.2d 366, 372 (Tex.App.—Beaumont 1990, pet. ref'd); *Williams v. State,* 649

S.W.2d 693, 696 (Tex.App.—Amarillo 1983, no pet.); *Winegarner,* 505 S.W.2d at 305. In *Fielder,* 756 S.W.2d at 309, the Court created a narrow exception for expert testimony concerning the mental state of a defendant at the time of a killing where the defendant was a victim of domestic violence. Even after *Fielder,* Texas courts have continued to exclude evidence concerning the mental state of defendants in cases that do not involve domestic violence. *See Arnold v. State,* 853 S.W.2d 543, 547 (Tex.Crim.App.1993). The only remaining question is whether Dr. Natalicio's testimony would be admissible under TEX.CODE CRIM.PROC.ANN. § 38.36, formerly TEX.PENAL CODE § 19.06. We conclude that the expert testimony would be inadmissible under this statutory provision.

Appellant attempted to offer Dr. Natalicio's testimony on the question of Appellant's mental state, and therefore his intent, during the episode that led to the offense and at the moment of the shooting itself. Appellant testified that he and his wife had been experiencing marital difficulties during the months leading up to the shooting. However, Dr. Natalicio did not offer any expert testimony concerning the relationship between Appellant and the victim. Rather, Dr. Natalicio's testimony exclusively concerned the psychology of law enforcement officers who are trained to respond to danger reflexively with a firearm, and his conclusion that Appellant responded to his wife, who allegedly wielded a pistol just before her death, reflexively and without intent. Appellant contends that this testimony was relevant to mental state because it could have led the jury to conclude that Appellant lacked the requisite intent to commit murder. At oral argument, Appellant offered one scenario under which Dr. Natalicio's testimony could lead the jury to such a conclusion: because Appellant testified that he knew the danger of firearms, his act of picking the pistol up off the floor could be viewed as a reckless act. If the jury accepted Dr. Natalicio's testimony that Appellant shot five times at his wife reflexively, then the jury could conclude that the reckless act of picking up the pistol, coupled with the reflexive act of shooting, constituted involuntary manslaughter.

Even if this testimony could have influenced the jury's decision with respect to the requisite mental states at issue, the testimony did not fit within this exception.

TEX.CODE CRIM.PROC.ANN. § 38.36 states:

(a) In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

(b) In a prosecution for murder, if a defendant raises as a defense of justification provided by Section 9.31, 9.32, or 9.33, Penal Code, the defendant, in order to establish the defendant's reasonable belief that use of force or deadly force was immediately necessary, shall be permitted to offer:

(1) relevant evidence that the defendant had been the victim of acts of family violence committed by the deceased, as family violence is defined by Section 71.01, Family Code; and

(2) relevant expert testimony regarding the condition of the mind of the defendant at the time of the offense, including those relevant facts and circumstances relating to family violence that are the basis of the expert's opinion.

Appellant contended at trial that the testimony of Dr. Natalicio was admissible under Section 38.36(a) because it involved "relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." However, we conclude that Section 38.36 was not intended to allow *expert* testimony concerning the state of mind of the defendant at the time of the offense unless such testimony related to the previous domestic relationship between the deceased and the accused.

The Code Construction Act dictates that when we encounter an ambiguity in a statute, we are to examine "common law or former statutory provisions." *See* TEX.GOV'T CODE ANN. § 311.023(4)(Vernon 1988). The prior statute, TEX.PENAL CODE § 19.06, included

the same language as the current TEX.CODE CRIM.PROC.ANN. § 38.36(a), upon which Appellant primarily relies. Read literally, this language would appear to swallow the general rule against expert testimony on the mental state of the accused at the time of the offense as stated in *Arnold*, 853 S.W.2d at 546–47; *Whitmire*, 789 S.W.2d at 372; *Williams*, 649 S.W.2d at 696; and *Winegarner*, 505 S.W.2d at 305. Such a reading would render all testimony concerning the mental state of the accused at the time of the offense admissible, whether offered by the defendant or by an expert.

■ Initially, we note that testimony from a criminal defendant concerning facts relevant to his or her mental state at the time of the offense is admissible under TEX.CODE CRIM.PROC.ANN. § 38.36(a), whether or not the testimony relates to former acts of violence in a domestic or familial context. *Dixon v. State*, 634 S.W.2d 855, 856–57 (Tex. Crim.App. [Panel Op.] 1982)(prior acts of violence by the intended victim admissible to show reasonableness of defendant's apprehension); *Henderson v. State*, 906 S.W.2d 589, 597 (Tex.App.—El Paso 1995, pet. ref'd.)(intended victim's alleged prior assaults on defendant or her family members admissible as to reasonableness of defendant's use of deadly force). However, neither *Dixon* nor *Henderson* specifically addressed the admissibility of *expert testimony* concerning the mental state of the defendant at the time of the offense. Further, TEX.PENAL CODE § 19.06, now TEX.CODE CRIM.PROC.ANN. § 38.36(a), was in effect when *Arnold*, *Whitmire*, and *Winegarner* were decided, all of which specifically excluded expert testimony on this issue. The broad phrase found in the statute—"together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense"—must be read in the context of these cases. Expert testimony concerning mental state of a defendant at the time of an offense is generally considered unreliable because "one person cannot possibly know another's state of mind." *Winegarner*, 505 S.W.2d at 305.

The amendments to former TEX. PENAL CODE § 19.06 found in the recodified TEX. CODE CRIM.PROC.ANN. § 38.36 support our construction of the statute. Subsection (a) corresponds to the old statute. Subsection (b) adds specific provisions relating to the admissibility of testimony concerning the mental state of the accused at the time of the crime where the defendant raises the defense of justification due to a history of family violence. As the Fort Worth Court Appeals pointed out in *Osby v. State*, 939 S.W.2d 787 (Tex.App.—Fort Worth 1997, no pet.), the Legislature intended in Section 38.36 to recodify former Section 19.06, and to codify *Fielder*, 756 S.W.2d at 318–20. In *Fielder*, the Court of Criminal Appeals carved out an exception to the rule recognized in cases such as *Winegarner*, 505 S.W.2d at 305. Although expert testimony concerning the mental state of the defendant at the time the offense was committed is generally inadmissible, *Fielder* allowed such testimony where a history of domestic violence existed between the victim and the defendant. After *Fielder*, expert testimony concerning family violence and its influence on the mind of the accused at the time of the crime became admissible.

We conclude that Subsection (a) refers generally to the "the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense," without specifically referring to family violence. Where testimony falls under the more general provisions of Subsection (a), the testimony is subject to the same restrictions imposed on testimony under former Section 19.06 by cases such as *Arnold, Whitmire,* and *Winegarner*. Testimony is admissible from the defendant, but not from an expert.

■ By contrast, Subsection (b)(1)(2) specifically allows for "relevant evidence that the defendant had been the victim of acts of family violence committed by the deceased," and for "relevant expert testimony regarding the condition of the mind of the defendant at the time of the offense, including those relevant facts and circumstances relating to family violence that are the basis of the expert's

opinion." As in *Fielder*, in order for expert testimony concerning the mental state of the accused at the time of the offense to be admissible, the expert must base his opinion in large part on the history of domestic violence between the defendant and the victim. As the Court noted in *Osby*, 939 S.W.2d at 790–91, the manner in which the prior statutory provision was revised and relocated clearly evidences the Legislature's intention to limit this provision to testimony concerning family violence and its influence on the defendant and the victim. *Osby*, 939 S.W.2d at 790–91.

Our interpretation of TEX.CODE CRIM.PROC. ANN. § 38.36 leads us to conclude that the expert testimony offered by Appellant in the present case was inadmissible. Because Dr. Natalicio focused exclusively on Appellant's training with handguns and the effect of this training on Appellant's mental state in committing the crime, rather than on the relationship between Appellant and his wife, his testimony does not qualify for admission under the exception created by TEX.CODE CRIM. PROC.ANN. § 38.36. Accordingly, the trial court properly excluded his testimony. Appellant's first point of error is overruled.

## LESSER-INCLUDED OFFENSES

■ In Points of Error Nos. Two through Five, Appellant urges that the trial court erred by refusing to submit the lesser-included offenses of involuntary manslaughter and criminally negligent homicide. Involuntary manslaughter and criminally negligent homicide are mutually exclusive lesser-included offenses of murder. *Saunders v. State*, 913 S.W.2d 564, 572 (Tex.Crim.App. 1995). A person commits involuntary manslaughter by recklessly causing the death of another. *Ybarra v. State*, 890 S.W.2d 98, 110 (Tex.App.—San Antonio 1994, pet. ref'd). A person commits criminally negligent homicide by causing the death of another through criminal negligence. *Ybarra*, 890 S.W.2d at 110. Involuntary manslaughter requires a finding that defendant was aware of the risk but consciously disregarded it; criminally negligent homicide requires a finding that defendant ought to have been aware of the risk but failed to perceive it. *Ybarra*, 890

S.W.2d at 110–11. "The key to criminal negligence is the failure of the actor to perceive the risk." *Richardson v. State*, 816 S.W.2d 849, 850 (Tex.App.—Fort Worth 1991, no pet.), *quoting Still v. State*, 709 S.W.2d 658, 660 (Tex.Crim.App.1986). At oral argument, Appellant conceded that the nature of the evidence would have precluded a finding of criminally negligent homicide, since Appellant himself testified to the effect that he was aware of the risks associated with firearms, but disregarded them on the night of the killing. Appellant has therefore voluntarily waived Points of Error Nos. Three and Five. We thus address only Points of Error Nos. Two and Four, which allege charge error with regard to the lesser-included offense of involuntary manslaughter.

█ To determine whether a jury must be charged on a lesser-included offense, the Court applies a two-part test. *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex.Crim.App.), *cert. denied*, 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993); *Gadsden v. State*, 915 S.W.2d 620 (Tex.App.—El Paso 1996, no pet.). First, the lesser-included offense must be included within the proof necessary to establish the offense charged. *Id.* Second, there must be some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense. *Id.* The credibility of the evidence and whether it conflicts with other evidence or is controverted may not be considered in determining whether an instruction on a lesser-included offense should be given. *Banda v. State*, 890 S.W.2d 42, 60 (Tex.Crim.App.1994), *cert. denied*, 515 U.S. 1105, 115 S.Ct. 2253, 132 L.Ed.2d 260 (1995). Regardless of its strength or weakness, if any evidence raises the issue that the defendant was guilty only of the lesser offense, then the charge must be given. *Saunders v. State*, 840 S.W.2d 390, 391 (Tex.Crim.App. 1992).

█ As we have noted, involuntary manslaugher is a lesser-included offense of murder. *Saunders*, 840 S.W.2d at 391; *Jones v. State*, 900 S.W.2d 103, 105 (Tex. App.—Houston [14th Dist.] 1995, no pet.). The first prong of the test is therefore met. We must next determine whether the record contains evidence that Appellant is guilty of only involuntary manslaughter. *Saunders*, 840 S.W.2d at 391; *Rousseau*, 855 S.W.2d at 673; *Jones*, 900 S.W.2d at 105. In making that determination, we examine all the evidence for any that would support a verdict of guilt only on the lesser charge. *Bignall v. State*, 887 S.W.2d 21, 23 (Tex.Crim.App. 1994). A mere scintilla of evidence will entitle defendant to the lesser charge. *Id.* We do not consider credibility of witnesses or conflicts in the evidence. *Saunders*, 840 S.W.2d at 391. A defendant's own testimony, though contradicted, is sufficient to require a lesser-included instruction. *Hunter v. State*, 647 S.W.2d 657, 658 (Tex.Crim.App.1983); *Jones*, 900 S.W.2d at 106.

The testimony upon which Appellant primarily relies is that of Dr. Luiz Natalicio, which we have already concluded was properly excluded. Appellant's own testimony concerning the moment of the shooting follows:

Q: Could you show more or less how she tried to kick you?

A: (Witness complies)

Q: And what happened at that point?

A: I saw a gun fall on the floor

. . .

Q: And where did the gun fall?

A: On the floor.

. . .

Q: At that point in time, Gilbert—I want you to go back and recall—what did you see?

A: As I looked towards her, I saw her holding a gun.

. . .

Q: She raised the gun like this, so when she raised the gun, what did you do?

A: I automatically reached for mine.

. . .

Q: You picked up the gun and started firing?

A: Yes.

Q: How many times did you fire?

A: I don't know.

Q: Did you fire more than one?

A: I think so.

. . .

Q: And you were discharging the weapon at the same time—

A: Yes, sir.

Q: In her general direction?

A: Yes, sir.

. . .

Q: Gilbert, what made you start shooting?

A: Seeing her gun.

Q: Did you put any thought into it?

A: No. I just reacted.

■ Involuntary manslaughter requires a finding that the defendant was aware of the risk but consciously disregarded it. Appellant's testimony concerning the night of the shooting was that his wife brandished a pistol, which caused him to pick up his own pistol, aim it at his wife, and fire a number of rounds. Appellant characterized his behavior as self-defense. His testimony that he acted in self-defense precludes an instruction on an accidental or reckless discharge of a weapon. *Mock v. State*, 848 S.W.2d 215, 219 (Tex.App.—El Paso 1992, pet. ref'd)("One cannot accidentally or recklessly act in self-defense."). We conclude that the trial court's failure to include involuntary manslaughter in the jury charge did not constitute error. Points of Error Nos. Two and Four are overruled. The judgment of conviction is affirmed.