Criminal Case Template




COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS



ESTHER RODRIGUEZ, a/k/a ESTHER
CAMPA RODRIGUEZ, a/k/a CAMPA,


 Appellant,


v.


THE STATE OF TEXAS,


 Appellee.

§


§


§


§


§

No. 08-01-00308-CR


Appeal from the


205th District Court


of El Paso County, Texas


(TC# 20000D04486)



O P I N I O N


 Esther Rodriguez appeals her conviction for murder. We affirm.

Facts


 Esther Rodriguez was having an affair with Francisco "Pancho" Mendoza. On
August 5, 2000, Rodriguez called her son, David Villaneuva asking him to pick her up at
a bar where Mendoza had left her. Villanueva and his girlfriend, Lorena Chavez, picked
up Rodriguez around 10 p.m. Rodriguez wanted to go to Mendoza's trailer to break off
the relationship and pick up some belongings she had left there.

 Pancho Mendoza initially would not let Rodriguez into the trailer. She began
calling Mendoza from the car, and Mendoza finally let Rodriguez in. Chavez could hear
Mendoza and Rodriguez arguing inside the trailer. Rodriguez came out of the trailer and
asked Villaneuva to come with her to help her move her things out of the trailer. 
Villaneuva entered the trailer, retrieved Rodriguez's possessions and returned to his car. Both Mendoza and Rodriguez exited the trailer. Rodriguez told Villaneuva to
leave and take a gray car parked by Mendoza's trailer with him. Although Rodriguez had
keys to the car, it would not start. Rodriguez and Mendoza began to argue again. 
Rodriguez started to push Mendoza around. Mendoza told Rodriguez not to take the car
or he would call the police. The two went in and out of the trailer several times, arguing
all the while. To Chavez, it appeared that Mendoza was trying to make Rodriguez leave.

 Chavez heard Mendoza scream, "No, Negra." "Negra" was Mendoza's nickname
for Rodriguez. Chavez could see Mendoza double over in the trailer, walk toward the
bedroom, and lean in the doorway. Rodriguez walked out of the trailer with a bloody
knife in her hand. Although Chavez did not see Mendoza hit Rodriguez, Rodriguez told
Chavez she was not going to let Mendoza hit her or make a fool of her. During the
course of their argument, Chavez never saw Mendoza stand between Rodriguez and the
front door of the trailer.

 Rodriguez instructed Chavez to rinse the knife off at a water hose near the trailer
and put it in Villaneuva's car. In Chavez's opinion, Rodriguez did not seem very upset. 
While Chavez was rinsing the knife, Villaneuva re-entered the trailer. Eventually,
Chavez entered the trailer with Rodriguez as well.

 Chavez and Villaneuva found Mendoza lying face down on the floor of the trailer. 
Mendoza was not making any noise, and Villaneuva turned him over. Chavez told
Villaneuva to get some cologne or alcohol to try to revive Mendoza. She also checked for
a pulse at his neck and wrist and found none. Rodriguez said Mendoza would wake up
and would be fine in a little while. Rodriguez removed Mendoza's watch from his hand.

 Chavez saw a stab wound below Mendoza's left collarbone. This was the same
part of his chest she saw him touch immediately after he yelled, "No Negra." Chavez told
Rodriguez and Villaneuva they should call an ambulance but they refused. Rodriguez
insisted that Mendoza had just fainted. Upon leaving the trailer, Rodriguez used a broom
to sweep away the tire tracks of Villaneuva's car. The trio then left the scene but returned
several minutes later at Rodriguez's request. Rodriguez and Chavez walked back to the
trailer, at which point Rodriguez collected several items including her clothes and
Mendoza's cell phone. Rodriguez used the bathroom while in the trailer and cleaned off
the toilet and sink faucets.

 Chavez and Rodriguez then left the trailer for the second time. Rodriguez used a
shirt to sweep away their footprints. Chavez finally called 911 on a pay phone and
reported that she had just heard her neighbors fighting and that she thought the police
should check on them. Chavez gave the police the address of Mendoza's trailer.

 Rodriguez asked Chavez if she knew a place to throw away the items they had
taken from the trailer. Chavez directed them to an apartment complex and Rodriguez
instructed Chavez to throw out the broom, the cologne, the knife, the green shirt, and 
toilet paper. Chavez did not see any scratches or bruises on Rodriguez, nor did she see
Mendoza hit Rodriguez when they were arguing. Villaneuva then took Chavez home, and
Chavez refused Rodriguez's request to accompany her across the border to Juarez.

 At about 2:30 a.m. on August 6, 2000, El Paso County Sheriff's officers arrived at
the trailer, which was unlocked and dark. Mendoza's body was on the floor by the bed. 
Blood was found throughout the trailer and on the front door.

 On September 26, 2000, Rodriguez was indicted for intentionally and knowingly
causing the death of an individual, "Francisco Medina," by using a knife. This misnomer
of the decedent provides the basis for a significant portion of this appeal.

 At trial, Rodriguez claimed she killed Mendoza in self-defense because she
suffered from battered woman's syndrome. She identified the decedent as Francisco
Mendoza Acevedo or "Mendoza," and testified that she had known him for six months
prior to his death. Rodriguez stated she was afraid of Mendoza because he told her he
had killed two people in Mexico. Rodriguez also feared Mendoza because he threatened
to kill her if she left him, and because he abused her physically as their relationship
progressed. Rodriguez also testified Mendoza hit her on the night of the murder when
they argued in his trailer. When Rodriguez was arrested three days after Mendoza's
killing, she had bruises on her face, legs, and arms.

 Rodriguez testified she made up her mind to end her relationship with Mendoza
after he left her at a bar the evening of August 5, 2000. She stabbed "Pancho" because
she wanted him to stop hitting her and she was afraid of him. She admitted she stabbed
him once with a knife without the intention of killing him. She also believed that
Mendoza was not dead when she left the trailer, but claimed she was too scared to call for
help and fled to Mexico the next afternoon.

 To support her self-defense claim, Rodriguez called psychologist Karen Gold. 
Based on results Gold obtained from tests she administered to Rodriguez, she opined that
Rodriguez probably suffered from battered woman's syndrome.

 On voir dire, defense counsel posed the following hypothetical to Gold:


 Now, Doctor Gold, I would ask you to assume that Esther met a 40 year old
man . . . and that this man was 5 feet 9 and a half inches tall, weighed 187
pounds and was a stonemason. . . . Assume further that this man was very
nice when Ms. Rodriguez first met him and that although she was already in
a common law relationship with another person she agreed to go out with
him. Further, assume that as the relationship progressed the man became
very possessive and went to great lengths to keep tabs on Esther and that he
became progressively more violent and abusive to Esther. In addition,
according to Esther that he had killed two men in Mexico. And that if she
tried to leave him, he would kill her.


 Now assume the two of them were out one night and got into an argument
and the man deserted her at a bar they were at and drove away in the car
they had come in. Assume further she called for a ride and one of her
children came for her and he along with his girlfriend went to the man's
trailer so that Esther could break the relationship off and collect some of her
personal belongings such as clothing and a CD player. Assume that when
she got there the man began to beat her and did not let her get all of her
belongings. Assume at that point she went to the kitchen and retrieved a
knife went over to where the man was where he wouldn't let her through
and stabbed him once and only once in the chest.


 Now, Doctor, based upon the hypothetical facts which I have just given to
you in your opinion and assuming these facts to be true could Esther have
stabbed the man in self-defense or could Esther have believed she stabbed
the man in self-defense?


 [Dr. Gold]: Yes.


The State objected to the introduction of this testimony because Rodriguez's relationship
with Mendoza did not fall within the definition of family violence referenced by article
38.36 of the Code of Criminal Procedure. The trial court sustained the objection only to
the extent that it would not permit the jury to hear the hypothetical and Gold's answer. 
Nevertheless, Gold was allowed to testify extensively concerning battered woman's
syndrome and to apply that information to Rodriguez and her circumstances. Rodriguez
was found guilty of having committed murder and was sentenced to 35 years'
imprisonment by the jury.

Legal Sufficiency of the Evidence


 In her first point of error, Rodriguez asserts the State failed to produce legally
sufficient evidence that she murdered Francisco Medina, the decedent named in the
indictment. She therefore concludes that she is entitled to a judgment of acquittal. We
disagree.

 Before reaching the merits of this issue, we observe that the misnomer here is
inexplicable. "Medina" and "Mendoza" are not particularly similar names, nor is anyone
named Medina associated with the facts here. The complaint affidavit in support of an
arrest warrant correctly names Francisco Mendoza as the dead man. As we discussed
during oral argument, this Court is concerned with the potential for prosecutorial abuse in
situations such as this. Nevertheless, we do not believe the State acted in bad faith here,
and defense counsel does not allege deliberate misnaming occurred. We must attribute
this mistake to pure negligence in drafting the indictment. To the credit of State's counsel
on appeal, he candidly admitted as much. We trust that more care will be taken in the
future to avoid needless mistakes, and we caution the State that we will remember this
case if the same problem occurs again.

 We now turn to the merits of appellant's point. Our standard of review with regard
to this issue is to view all the evidence in the light most favorable to the verdict to
determine whether any rational fact finder could conclude the essential elements of the
crime as alleged were proven beyond a reasonable doubt. Jackson v. State, 17 S.W.3d
664, 668-69 (Tex. Crim. App. 2000); Levario v. State, 964 S.W.2d 290, 294 (Tex. App.--El Paso 1997, no pet.). We must also presume that the jury, as the exclusive judge of the
credibility of the witnesses and the weight to be given their testimony, resolved any
conflicting inferences in favor of the verdict. Fuentes v. State, 991 S.W.2d 267, 271
(Tex. Crim. App. 1999).

 For Rodriguez to succeed on her legal sufficiency claim, the name of the decedent
must be a "'substantive element of the criminal offense as defined by state law.'" Fuller
v. State, 73 S.W.3d 250, 252 (Tex. Crim. App. 2002). The Court of Criminal Appeals has
specifically rejected this conclusion. Id. at 252-53. In Fuller, defendant was charged
with "injury to an elderly individual," his father. Id. at 251. The indictment and the
charge identified "Olen M. Fuller" as the victim. Id. However, at trial the victim was
referred to as "Mr. Fuller" or "Buddy," and the State did not present any evidence at trial
that "Olen M. Fuller" was the defendant's father. Id. The Fuller court held that the
victim's name was not a substantive element of the crime because the penal code defined
that offense as "injury to an elderly individual," not "injury to an elderly individual named
Olen M. Fuller." Id. at 253. The same logic applies here.

 Rodriguez was charged under Tex. Penal Code Ann. § 19.02(b), which provides
that "[a] person commits an offense if he (1) intentionally or knowingly causes the death
of an individual; [or] (2) intends to cause serious bodily injury and commits an act clearly
dangerous to human life that causes the death of an individual." Tex. Penal Code Ann.
§ 19.02(b)(1) and (2) (Vernon 1994). The Penal Code does not require the identification
of the defendant's victim as a substantive element of the crime. See Fuller, 73 S.W.3d at
254. Rodriguez's Point of Error One is therefore overruled. (1)


Fatal Variance


 In her second point of error, Rodriguez maintains she is entitled to a new trial
because the variance between the indictment, which named Francisco Medina, and the
proof at trial that the decedent was Francisco Mendoza, was material and therefore fatal
to the State's prosecution. To support her contention, she relies upon the Court of
Criminal Appeals' Gollihar case.

 In recent years, the Court of Criminal Appeals has consistently held that a variance
between indictment and proof is fatal to a conviction only if "'it is material and prejudices
[the defendant's] substantial rights.'" Gollihar v. State, 46 S.W.3d 243, 257 (Tex. Crim.
App. 2001); see also Fuller, 73 S.W.3d at 253. This requires a determination of whether
the variance deprived defendant of notice of the charges against her such that her ability 
to prepare an adequate defense at trial was compromised, or whether the variance subjects
defendant to the risk of later prosecution for the same offense so as to create a double
jeopardy problem. Fuller, 73 S.W.3d at 253; Gollihar, 46 S.W.3d at 257-58; Washington
v. State, 59 S.W.3d 260, 262-63 (Tex. App.--Texarkana 2001, pet. ref'd) (use of
pseudonym to identify victim in indictment not fatal variance when record reflects
defendant had actual knowledge of complainant's real name).

 The burden to prove whether the variance is material, including a demonstration
that it resulted in surprise or prejudice, rests with the defendant. Santana v. State, 59
S.W.3d 187, 194 (Tex. Crim. App. 2001); Serna v. State, 69 S.W.3d 377, 382 (Tex. App.
--El Paso 2002, no pet.). Rodriguez contends she was misled by the State's misnomer of
Francisco Mendoza as Francisco Medina because the incorrect name on the indictment
prevented her from investigating the allegation that Mendoza killed two people in
Mexico. She asserts that such investigation was necessary to bolster her claim of self-defense. This assertion comes for the first time on appeal. A contention not raised before
the trial court for consideration is not preserved for review by this Court. State v.
Mercado, 972 S.W.2d 75, 77 (Tex. Crim. App. 1998). Rodriguez points to no other harm
that stemmed from the State's misnaming of Mendoza in the indictment.

 Moreover, Rodriguez's self-defense claim did not depend on her capacity to prove
the truth of Mendoza's statement to her that he murdered two people in Mexico.
Rodriguez's defense instead hinged on whether she believed that Mendoza had killed
before, such that it had an impact on her state of mind on the night of his murder. See
Tex. Code Crim. Proc. Ann. art. 38.36 (Vernon Supp. 2003). Her asserted need to
investigate that information was therefore not critical to her defense.

 Further, we note that this record is replete with evidence that Rodriguez knew she
killed Francisco Mendoza and that Francisco Mendoza, not Francisco Medina, told her he
had killed two men in Mexico. See Reyes v. State, 3 S.W.3d 623, 625 (Tex. App.--Houston [1st Dist.] 1999, no pet.) (no material variance exists where defendant is not
surprised by identity of complainant).


 Rodriguez next contends the instant indictment would be no bar to another
prosecution against her for murder, thus implicating Gollihar's definition of a fatal
variance as one that subjects the defendant to double jeopardy. We reject this argument. 
When determining whether double jeopardy applies to a subsequent prosecution, the
defendant may avail herself of the entire record, not just the charging instrument. 
Santana, 59 S.W.3d at 195. As previously discussed, the record in this case contains
ample evidence that Rodriguez murdered Francisco Mendoza. For all these reasons, we
overrule Point of Error Two.

Admissibility of Expert Opinion


 In her final point of error, Rodriguez contends the trial court erred in refusing to
allow her expert witness, psychologist Karen Gold, to testify to a hypothetical which
would have permitted expert testimony concerning the ultimate issue in the case, that is,
whether Rodriguez stabbed Mendoza in self-defense or believed she stabbed Mendoza in
self-defense. The trial court sustained the State's objection as to the admission of this
testimony.

 As with all questions concerning the admission of evidence, we apply an abuse of
discretion standard of review. Avila v. State, 954 S.W.2d 830, 837-38 (Tex. App.--El
Paso 1997, pet. ref'd). If the trial court's ruling lies within a zone of reasonable
disagreement, we may not reverse that decision. Levario, 964 S.W.2d at 297. 
Furthermore, if the trial court's decision to exclude Rodriguez's evidence is correct under
any legal theory of law applicable to this case, its decision will be affirmed. Weatherred
v. State, 975 S.W.2d 323, 323 (Tex. Crim. App. 1998).

 Texas law permits the introduction of evidence relevant to the defendant's state of
mind in support of a self-defense theory. Fielder v. State, 756 S.W.2d 309, 319-20 (Tex.
Crim. App. 1988) codified at Tex. Code Crim. Proc. Ann. art. 38.36 (Vernon Supp.
2003). The defendant is thus allowed to introduce "relevant evidence that the defendant
had been the victim of acts of family violence committed by the deceased, as . . . defined
by Section 71.01, Family Code; and . . . relevant expert testimony regarding the condition
of the mind of the defendant at the time of the offense, including those relevant facts and
circumstances relating to family violence that are the basis of the expert's opinion." Tex.
Code Crim. Proc. Ann. art. 38.36 (Vernon Supp. 2003).

 Dating violence, as Rodriguez contends she was subjected to, was not included
within the definition of "family violence" at the time of the offense or trial here. The
Family Code presently defines "family violence" as:

 (1) an act by a member of a family or household against another member of
the family or household that is intended to result in physical harm, bodily
injury, assault, or sexual assault or that is a threat that reasonably places the
member in fear of imminent physical harm, bodily injury, assault, or sexual
assault, but does not include defensive measures to protect oneself;


 (2) abuse, as that term is defined by Sections 261.001(1)(C), (E), and (G),
by a member of a family or household toward a child of the family or
household; or


 (3) dating violence, as that term is defined by Section 71.0021. 


Tex. Fam. Code Ann. § 71.004 (Vernon 2002). Significantly, section 3 was added to the
statute on September 1, 2001, that is, after Rodriguez was tried for Mendoza's murder.

 Rodriguez did not live with Mendoza, nor were they ever members of the same
household, nor were they "family" as that term is defined by statute. Gold's proposed
testimony was therefore properly excluded because Rodriguez's relationship with
Mendoza did not at the time of her trial, fall within the definition of family violence. 
Tex. Code Crim. Proc. Ann. art. 38.36 (Vernon Supp. 2003). For these reasons,
Rodriguez's third point of error is overruled.

Conclusion


 The conviction is affirmed.


 

 SUSAN LARSEN, Justice

February 27, 2003


Before Panel No. 1

Larsen, McClure, and Chew, JJ.


(Do Not Publish)

1. Rodriguez supports Point of Error One with a single authority, King v. State, 594 S.W.2d
425 (Tex. Crim. App. 1980). King does not aid Rodriguez's position. The case holds defendant
must raise objections to the indictment via a pretrial motion to quash--a procedural requirement
which Rodriguez did not satisfy. Id. at 426; see Grant v. State, 970 S.W.2d 22, 23 (Tex. Crim.
App. 1998) (missing first name of complainant not variance but instead reflects a defective
information to which defendant must object prior to trial pursuant to Tex. Code Crim. Proc.
Ann. art. 1.14(b) to preserve issue for review).