# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00598-CR

**Kristopher Marsh, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
NO. 1010660, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING**

---

## MEMORANDUM OPINION

Appellant Kristopher Marsh appeals from his conviction of the offense of murder. *See* Tex. Pen. Code Ann. ' 19.02(1)(2) (West 1994). The jury assessed appellant=s punishment at life imprisonment. In his sole point of error, appellant asserts that the trial court erred in refusing to instruct the jury on the lesser-included offense of manslaughter. We will affirm.

The trial court instructed the jury on the two theories of murder alleged in the indictment, that (1) appellant intentionally and knowingly struck Michael Adelman with a bat causing Adelman=s death, and (2) appellant, intending to cause serious bodily injury to Adelman, struck Adelman with a bat, a deadly weapon, an act clearly dangerous to human life, causing Adelman=s death. However, the trial court refused appellant=s requested charge on the lesser-included

offense of manslaughter. An accused is guilty of manslaughter if he recklessly causes the death of an individual.[1] *See* Tex. Pen. Code Ann. ' 19.04 (West 1994).

To determine whether a charge on a lesser-included offense should have been given, a two-step test is used. *See Feldman v. State*, 71 S.W.3d 738, 750 (Tex. Crim. App. 2002); *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex. Crim. App. 1985); *Royster v. State*, 622 S.W.2d 442, 444 (Tex. Crim. App. 1981) (plurality opinion). The first step is the determination of whether the offense is a lesser-included offense of the charged offense. *See* Tex. Code Crim. Proc. Ann. art. 37.09 (West 1981); *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993). Manslaughter is a lesser-included offense of murder. *See Saunders v. State*, 913 S.W.2d 564, 572 (Tex. Crim. App. 1995); *Avila v. State*, 954 S.W.2d 830, 841 (Tex. App.CEl Paso 1997, pet. ref=d).

---

[1] A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor=s standpoint.

Tex. Pen. Code Ann. ' 6.03(c) (West 1994).

The second step of the test requires a determination of whether the record contains evidence that would permit a rational jury to find the defendant guilty only of the lesser-included offense. *See Feldman*, 71 S.W.3d at 750; *Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998); *Rousseau*, 855 S.W.2d at 672-73. In other words, the evidence must be such that a rational jury could acquit the defendant of the greater offense while convicting him of the lesser offense. *Feldman*, 71 S.W.3d at 750-51; *Moore*, 969 S.W.2d at 8. In applying the second step of the test, the reviewing court must examine the entire record instead of plucking certain evidence from the record and examining it in a vacuum. *Enriquez v. State*, 21 S.W.3d 277, 278 (Tex. Crim. App. 2000); *see also Ramos v. State*, 865 S.W.2d 463, 465 (Tex. Crim. App. 1993); *Godsey v. State*, 719 S.W.2d 576, 584 (Tex. Crim. App. 1986). When, as in this case, the State has tried a defendant on alternative theories of murder, the defendant is entitled to a requested lesser-included offense charge if a rational jury could convict him only of the lesser-included offense after considering each of the alterative theories of commission. *See Feldman*, 71 S.W.3d at 752.

On the night of October 5, 2000, appellant=s girlfriend, Kimberly Haley, and his former girlfriend, Ronnie Maxwell, were together in a downtown Austin nightclub. Michael Adelman, with whom Haley and Maxwell were not previously acquainted, was also in the nightclub. Haley and Maxwell danced with Adelman, but when Haley became offended by Adelman=s conduct, she called appellant. Appellant came to the nightclub and demanded that Adelman apologize to Haley and Maxwell. Adelman, a much larger man than appellant, laughed and ignored appellant. Appellant then approached a club bouncer and asked him to admonish Adelman. The bouncer also ignored appellant. While talking to the bouncer, appellant noticed Adelman near Haley and

**3**

Maxwell and that Adelman was Aactually messing@with Maxwell.  Appellant angrily demanded that Adelman  stop and told Adelman that he was not going to sit by and let him do whatever he wanted to do with his girlfriend and with Maxwell.  Appellant testified he told Adelman that if he kept putting his hands on Haley and Maxwell, he was not going to be able to walk out of the club.  According to appellant, Adelman laughed at him and said, AI am bullet proof in here.@

Appellant, unsuccessful in obtaining an apology from Adelman, left the nightclub and drove to his apartment and obtained a baseball bat.  Appellant intended to confront Adelman when Adelman left the club and to force him to apologize to the young ladies.  Appellant hid the bat outside of the club.  When he returned, the club was closing, and appellant, Haley, and Maxwell were standing near the bar when Haley told Maxwell that Awe are fixing to start some s--t.@ Adelman then walked past and Haley reached and grabbed Adelman=s chest and pinched his nipple.  Adelman pushed Haley=s hand aside and Ajust kind of laughed and kept walking.@

Before the club closed, Michael Girard, the club=s owner and a friend of Adelman, thought that Adelman, although not drinking in his club, had earlier consumed too much alcohol to be driving.  Girard asked his friend, Keith Ann Gorton, to assist him in taking Adelman to his apartment.  Girard, accompanied by Adelman, drove Adelman=s SUV to the apartment complex in Northwest Austin where Adelman lived.  Gorton, driving Girard=s SUV, followed Girard and Adelman to the apartment complex.  When they entered the apartment complex, Girard noticed a white SUV that had been following them stop abruptly and enter the complex.  Girard was concerned and, after parking Adelman=s SUV, went to investigate.  Adelman exited his SUV and was helping Gorton park Girard=s large vehicle.

Appellant, Haley, and Maxwell left the club. Appellant retrieved the bat, but had no opportunity to confront Adelman outside of the club. Haley and Maxwell got into appellant=s SUV and appellant followed the SUVs driven by Girard and Gorton to the apartment complex where Adelman lived. When they reached the complex, appellant parked, turned off the lights, and left the engine running; Haley got in the driver=s seat. Appellant took the bat and ran toward the area of the complex where he saw SUV brake lights.

Gorton testified that Adelman was standing close to the left front wheel of the vehicle she had been driving; he was directing her into a narrow parking slot. Gorton saw a man come running up out of the darkness carrying an aluminum baseball bat. The man came up behind Adelman and struck Adelman on the head one or two times before Adelman went down on the ground. Adelman was on his knees with his face on the ground and his arms were covering the back of his head. While Adelman remained on the ground, his assailant Ahit him probably nine, ten times.@ When he was first struck, Adelman was facing Gorton. Gorton testified that Adelman never turned around to look at his assailant and never attempted to fight back.

The man attacking Adelman appeared to be angry; he looked up and saw Gorton and Aproceeded to bash in the driver=s side window, which shattered all over the car.@ Gorton crawled over the console into the back seat. Adelman=s assailant ran toward and entered a white SUV, taking the bat with him. The SUV then sped away. Appellant laughed and told Haley and Maxwell that he Ajust kept hitting him and hitting him and there was no way he was getting up.@

5

After parking Adelman=s SUV, Girard walked toward the entrance to the apartment complex. He saw a white SUV parked at the edge of an apartment building. During this investigation, Girard caught a glimpse of a man running through the dark carrying what looked like a shotgun. The man dodged behind a dumpster. Girard, fearing for his safety, walked around one of the apartment buildings. He heard glass breaking and heard Gorton yell his name. Girard ran to Gorton and Adelman and found Adelman on his knees on the ground, supporting his upper body with his face. Adelman was hunched over with his arms behind him and his head pointed toward the front of Girard=s SUV. Adelman was bleeding from his nose, mouth, elbow and knees. Adelman was unable to talk but moaned from the pain of his injuries. Girard called 911.

A neurosurgeon declared Adelman Abrain dead,@ and Adelman was removed from life support and died on October 11, 2000. On October 12, Travis County deputy medical examiner Dr. Elizabeth Peacock performed an autopsy on Adelman=s body. Injuries on Adelman=s knees were consistent with his falling to his knees. There was a large bruised area on the back of his hand; he had a compound fracture of his right index finger and extensive contusions on his upper right arm. Dr. Peacock characterized those wounds as defensive wounds. Adelman suffered extensive skull fractures on the right side, subdural hemorrhage on the left side, and an extensive contusion behind his right ear. Dr. Peacock testified that it took Asome real force@ to break Adelman=s skull as it had been broken. Adelman took three direct hits to his scalp; any of the blows behind Adelman=s ear and on the right side of his head could have been fatal. Death was caused by cranial cerebral trauma. Dr. Peacock testified that Adelman=s injuries were consistent with his being struck on the head with a baseball bat and that a baseball bat could be a deadly weapon.

**6**

Police officers had no suspects in the commission of Adelman=s murder until Nicholas Frescas and Jordan Baker called Crimestoppers after Thanksgiving. Both gave statements to police and testified at trial. Baker, Frescas=s girlfriend, shared an apartment with Haley. In the evening on October 5, 2000, Baker and Frescas watched television in Baker=s apartment; Haley and appellant were not there. The following morning, appellant and Haley entered Baker=s bedroom and appellant told Baker and Frescas that he had beaten somebody up who had been Amessing@ with Haley at a club. Appellant said he followed the Aguy@ home, Acrept up behind him,@ and beat him with a bat, indicating that he hit the victim several times. Appellant told them he hit the victim with a bat and Areally f-----d him up.@ Frescas testified that appellant was arrogant, cocky, and showed no remorse whatsoever. Baker saw appellant appearing to remove blood from a baseball bat. Later, Frescas and Baker saw news reports that Adelman was in critical condition and then that he had died. They also saw posters in a club describing Adelman=s assailant and his car; the descriptions matched appellant and his car. Frescas, fearing for Baker=s safety, insisted that Haley release Baker from her obligation under the apartment lease so that Baker could move. Haley and appellant agreed to release Baker=s lease obligation. Frescas and Baker were afraid of appellant because they knew he possessed a number of firearms and handguns. On Thanksgiving Day, Frescas visited his family in El Paso and Baker visited her family in Wichita Falls. Both families insisted that Frescas and Baker tell law enforcement officers what they knew about Adelman=s murder. This prompted their calls to Crimestoppers when they returned to Austin.

Appellant testified in his own defense. After he exited his SUV and ran toward the apartments, he saw Girard coming towards him so he ducked behind a dumpster until Girard passed.

7

Appellant then saw Adelman assisting Gorton park Girard=s SUV. Appellant moved toward Adelman. Appellant testified that Adelman turned slightly toward him; whereupon, the appellant almost blanked out. Appellant remembered absolutely nothing about the attack on Adelman. Appellant did not remember hitting Adelman or breaking the window of the SUV in which Gorton was sitting. Appellant testified that he closed his eyes and swung wildly. Appellant claimed he did not intend to injure or kill Adelman.

On cross-examination, appellant agreed that he caused Adelman=s death by striking him with a bat. He agreed that the bat was a deadly weapon in the manner of its use in this case. He agreed that striking Adelman in the head with a bat was an act clearly dangerous to human life. He testified that he was really mad and looking for an apology but insisted he did not have the intent to injure or kill Adelman.

Appellant argues that his Adefense, in essence, was that he was guilty of manslaughter . . . but not guilty of murder@ and insists that his Atestimony was clearly sufficient to entitle him to a lesser-included offense charge on manslaughter.@ In his brief, appellant has directed our attention to his testimony that he believes is pertinent.

Q: What happened next?

A: Mr. Girard got out of my sight. I came around the dumpster and I saw Mr. Adelman guiding a car into a covered parking spot.

Q: What happened next?

A: I moved towards him and he turned and he slightly looked at me and I don=t know how to B I *blanked out almost*.

Q: Let me ask you this: Did you go up and just hit him in the back of the head or do you have a clear memory of him turning toward you?

**8**

*A:   I have a clear memory of him turning towards me.*

Q:   Do you remember the very first blow that you landed?  Do you remember anything about the conflict that followed?

A:   No, sir.

Q:   Tell the jury what it is you do remember from the moment that he turned toward you until you were back in the Explorer.  Do you remember hitting him?  Do you remember the way in which the blows were struck or what sequence they came in?

A:   No, sir, I don=t remember anything at all.  *I had my eyes closed.  I just know I was swinging wildly.*

Q:   Do you remember, for example, smashing the driver=s side window out of the Navigator?

A:   No.

Q:   If you can remember, while this is happening and while you are swinging the bat, are you in close proximity to the Navigator, or do you remember?

A:   No, I don=t remember, but I am guessing I would have had to have been.  When I first saw Mr. Adelman, he was pretty close to the car.  If the window was broken, obviously I had to be close enough.

Q:   Did you have B *as you moved toward him, as you got behind the dumpster, did you have any intention to cause him any physical harm?*

A:   *No, none at all.*

Q:   Did you have any intent to, as someone said here, Af--k him up,@ end quote?

A:   No, sir.


(Emphasis added by appellant.)

**9**

Reckless conduct that causes the death of an individual is manslaughter. *See* Tex. Pen. Code Ann. ' 19.04 (West 1994). Does appellant=s testimony show that Adelman=s death was the result of appellant=s reckless conduct? Reckless conduct involves conscious risk creation, that is, the actor was aware of the risk surrounding his conduct or the result of his conduct, but consciously disregarded that risk. *See* Tex. Pen. Code Ann. ' 6.03(c) (West 1994); *Lewis v. State*, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975); *Montoya v. State*, 744 S.W.2d 15, 29 (Tex. Crim. App. 1987); *Thomas v. State*, 699 S.W.2d 845, 849 (Tex. Crim. App. 1985); *Arellano v. State*, 54 S.W.3d 391, 393 (Tex. App.CWaco 2001, pet. ref=d); *Juneau v. State*, 49 S.W.3d 387, 392 (Tex. App.CFort Worth 2000, pet. ref=d); *Cardona v. State*, 973 S.W.2d 412, 416 (Tex. App.CAustin 1998, no pet.); *Henderson v. State*, 825 S.W.2d 746, 751 (Tex. App.CHouston [14th Dist.] 1992, pet. ref=d).

While appellant=s testimony that he Ablanked out almost,@ Adidn=t remember anything at all,@ was Aswinging wildly@ with his Aeyes closed,@ and that he did not intend to cause Adelman any physical harm, may arguably be calculated to rebut evidence that his conduct was intentional, it does not support his contention on appeal that he merely acted recklessly. Appellant=s testimony does not show that at the time he acted he was aware of the risk surrounding his conduct or the result of his conduct but that he consciously disregarded the risk. Appellant=s testimony was that he was *unaware* of his *conduct*, not that he consciously disregarded a known risk that he was aware his conduct created.

After examining and considering appellant=s testimony and all of the evidence in the record, we conclude that a rational jury could not have acquitted appellant of the offense of murder while convicting him of the lesser offense of manslaughter. The evidence would not permit a rational jury to find appellant

**10**

guilty of only the lesser-included offense.  The trial court did not err in refusing to charge the jury on the

lesser-included offense of manslaughter.  Appellant=s point of error is overruled.

The judgment is affirmed.



Carl E. F. Dally, Justice

Before Justices Puryear, Dally[*] and Aboussie[*]

Affirmed

Filed:   January 24, 2003

Do Not Publish


[*]   Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment.  *See* Tex. Gov=t Code Ann. ' 74.003(b) (West 1998).


12

\*    Before Marilyn Aboussie, Chief Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov=t Code Ann. ' 74.003(b) (West 1998).