**James David BROWN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 53932.**

Court of Criminal Appeals of Texas.

Panel No. 1.

Feb. 1, 1978.

Rehearing en banc Denied March 1, 1978.

Cletus C. Schenk, Wichita Falls, for appellant.

Timothy D. Eyssen, Dist. Atty., Wichita Falls, Austin, for the State.

Before TOM G. DAVIS, DALLY and W. C. DAVIS, JJ.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. The jury returned a "No" answer to the question required by Art. 37.071(b)(2), V.A.C.C.P., concerning the probability that appellant would commit future criminal acts of violence that would constitute a continuing threat to society. Appellant's punishment was automatically assessed at life. Since appellant contends that the evidence is insufficient to support the conviction, a detailed recitation of the facts is necessary.

The record reflects that the appellant, a police officer in Wichita Falls, made arrangements to have his wife killed in return for the payment of $400. Zelma Lee Strader, the manager of a convenience store appellant often frequented, testified that appellant requested that she find a "hit man to get rid of his wife." Strader in turn contacted a man named Harley Zinn Main about the matter. Main then contacted two individuals named Mark Douglas Fields and Gene Edwin Gameson, who eventually committed the murder.

Appellant and his wife Linda had been separated for several months before the murder, and divorce petitions had been filed. The deceased continued to live in their home with their two young daughters, while the appellant moved in with his parents. The deceased's body was discovered by a neighbor on the morning of April 19,

1975. The body was lying just inside the door of her residence. The wooden door was standing open but a glass "storm door" was closed and locked. There was some broken glass on the porch. The deceased had been shot one time in the area of her neck. The deceased was last seen alive by a friend who left the house at approximately 10:40 p. m. on April 18, 1975. At the time of the killing, the two daughters were with appellant in the course of a regular weekly visitation.

At the trial, Strader testified that the appellant first approached her about finding a "hit man" in late February or early March, 1975. Strader talked to several people about the appellant's request. The last person she spoke to was Harley Zinn Main. Both Strader and Main were employed in a Jiffy Store on Iowa Park Road in Wichita Falls. After speaking to Main, Strader related that she reported back to the appellant that the job would cost $400, with $200 due immediately and the remaining $200 when the job was done. Appellant delivered $200 to her and she passed it on to Main. After she had delivered the money, Strader stated that the appellant frequently asked "when the job would be completed." Strader and Main had several discussions about how the killing was to occur. On the morning after the homicide, the appellant arrived at the Jiffy Store in police uniform to have his regular morning cup of coffee. While he was there, appellant told her he hadn't heard about Linda's death on the radio yet. Finally, Strader testified that four to five weeks after the killing appellant delivered another $200 to her and she passed this money along to Fields and Gameson.

Harley Zinn Main testified that he was employed at the Jiffy Store and worked the 11:00 p. m. to 7:00 a. m. shift. Main also attended school at Aero Technical Institute. Main related that Strader told him the appellant "was willing to pay to get shed of her, his old lady." Main said he then approached Fields, who was a friend of his at Aero Tech, and offered him the job. Main called Strader back and asked how much

the appellant would be willing to pay. Strader told him that appellant said he would pay "four or five hundred dollars." Later that day, Main and Fields went to the Jiffy Store and picked up $200 from Strader. Main gave the money to Fields. Main stated that Strader told him on at least two occasions that the appellant wanted to know when the job was going to be done. On one occasion, about four days before the killing, appellant came into the store and asked Main "when they are going to take care of the job." Main said he didn't know, and appellant replied, "The sooner the better." Between the 15th and 18th of April, 1975, Fields came to the Jiffy Store and showed Main a new gun he had purchased. Main further testified that on the night of April 18, 1975, shortly after he went to work at 11:00 p. m., he received a phone call from Gameson, who told him, "The job has been done."

Gene Edwin Gameson testified he was approached by Main and Fields about participating in the killing. Gameson said he heard the sum of $400 being discussed as "payment for somebody being shot." Gameson related that "numerous times" before April 18, 1975, he and Fields had "looked at" the house located at 2602 Hairpin Curve where the deceased lived. Gameson and Fields went to the house between 8:00 and 9:00 p. m. on April 18, 1975, and observed that the deceased had company. They returned between 10:30 and 11:00 p. m., when the company had left. They parked the car in an area near the city aqueduct. Gameson stated that both he and Fields had "extensively" used drugs and alcohol before they arrived at that location. According to Gameson, Fields "walked up the aqueduct to Hairpin Drive" and then "went through a back yard" where he lost sight of him. Fields was carrying a .357 magnum Luger pistol when he left the car. In approximately five minutes, Gameson heard a shot and Fields came running back to the car. Fields was "very excited" when he returned to the car. Upon his return to the car, Fields said: "I hit her, she hit the wall and then hit the door. I think she's dead." Gameson then observed Fields extract a single empty shell from the gun. Gameson and Fields received the second $200 from Strader at the Jiffy Store two or three weeks after the shooting. Gameson stated that Fields paid him $50 for his part in the killing.

The State also offered the testimony of Carla Gibbins, who was identified as appellant's one-time girl friend. Gibbins testified that appellant often visited the store where she worked while he was on duty. Appellant told her that "a friend of his knew a friend or knew someone who could 'blow her [the deceased] away,' that was the terminology he used." Gibbins gave the following testimony concerning how appellant told her this would be done:

"He said that there would be—you know, I thought maybe he meant, you know, someone would just walk up to her in the street, you know, and kill her or something, but he said no, that they would walk up on the front porch, ring the door bell and then when she came to the door that they would blow her away."

In response to her questions about whether his plan would endanger his two daughters, appellant told Gibbins that "it would happen on a Friday night when he had the children with him." Gibbins related that between one and two weeks before the killing, the appellant showed her a "roll of money" and told her it was his "down payment." Gibbins was unable to tell how much money was contained in the "roll." Gibbins' testimony concerning appellant's comments on his chance of being caught reflects the following:

"Q. During the times that he would discuss with you how this incident would occur concerning his wife, did you ever talk to him about the possible suspects of the case?

"A. I told him that if something like this happened that he ought to realize he would be the first one that the police would come in and question.

"Q. What did he say in response to that, anything?

"A. He just kind of laughed and said, 'Well, they can't prove it.'"

Finally, Gibbins testified that on the morning of April 18, 1975, the day of the shooting, appellant came to the Radio Shack where she worked and made two telephone calls. The second phone call was to a man who was working on her car, but during the first call he "talked rather softly over the phone, kind of held his hand over the receiver so no one could hear him." Gibbins asked appellant whom he had called, and he replied that he had called Aero Tech.

Appellant's challenge to the sufficiency of the evidence is bottomed on the contention that there was inadequate corroboration of the accomplice witnesses' testimony. Article 38.14, V.A.C.C.P., provides:

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."

In *Edwards v. State,* 427 S.W.2d 629, 632, we said:

"The test as to the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witness and then to examine the evidence of other witnesses with the view to ascertain if there be inculpatory evidence, that is evidence of incriminating character which tends to connect the defendant with the commission of the offense. If there is such evidence, the corroboration is sufficient; otherwise, it is not."

See also *Caraway v. State,* Tex.Cr.App., 550 S.W.2d 699; *Loa v. State,* Tex.Cr.App., 545 S.W.2d 837; *Etheredge v. State,* Tex.Cr.App., 542 S.W.2d 148; *Williams v. State,* Tex.Cr.App., 542 S.W.2d 131; *James v. State,* Tex.Cr.App., 538 S.W.2d 414; *Deas v. State,* Tex.Cr.App., 531 S.W.2d 810; *Moore v. State,* Tex.Cr.App., 521 S.W.2d 263; *Bentley v. State,* Tex.Cr.App., 520 S.W.2d 390; *Forbes v. State,* Tex.Cr.App., 513 S.W.2d 72; *Cherb v. State,* Tex.Cr.App., 472 S.W.2d 273.

■ It is also well established that the corroborative testimony need not directly link the accused to the crime or be sufficient in itself to establish guilt. *Lyman v. State,* Tex.Cr.App., 540 S.W.2d 711; *Bentley v. State,* supra; *Black v. State,* Tex.Cr.App., 513 S.W.2d 569; *Cherb v. State,* supra. The corroboration need only make the accomplice's testimony more likely than not. *James v. State,* supra; *Bentley v. State,* supra; *Warren v. State,* Tex.Cr.App., 514 S.W.2d 458.

The trial court properly instructed the jury that Strader, Main, and Gameson were accomplice witnesses as a matter of law. After we eliminate their testimony, we are left with the following facts: (1) Linda Brown was killed by a single gunshot wound to the area of her neck at approximately 11:00 p. m. on Friday, April 18, 1975; (2) the deceased was shot through the locked "storm door" on the front door of her house; (3) the appellant told Carla Gibbins that a friend of a friend would blow his wife away for him; (4) the appellant told Gibbins that the killing would take place when someone rang the deceased's door bell and shot her as she answered the door; (5) appellant told Gibbins that the killing would occur on a Friday night when he had his daughters with him; (6) appellant showed Gibbins a "roll of money" and told her it was for his "down payment"; (7) appellant was not concerned that he would be a suspect, saying the police couldn't prove his involvement; and (8) on the morning of the killing appellant made a hushed phone call to Aero Tech, where Main, Fields, and Gameson all attended school.

■ We find that the evidence was sufficient to connect appellant with the commission of the offense, and conclude that the evidence supports the conviction.

Appellant next complains that he was denied equal protection of the law because he was charged under V.T.C.A. Penal Code, Sec. 19.03(a)(3)[1] (Capital Murder based on

---

1. V.T.C.A. Penal Code, Sec. 19.03, provides, in pertinent part:

"(a) A person commits an offense if he commits murder as defined under Section 19.-02(a)(1) of this code and:

employing another to commit the murder) instead of V.T.C.A. Penal Code, Sec. 15.03 [2] (Criminal Solicitation). Specifically, he complains that the statutes are "duplicative" and that he was denied equal protection by being charged with the more serious of the offenses.[3]

■ Appellant is incorrect in his contention that the statutes are "duplicative." Section 19.03, supra, contains the requirement that a murder must actually have been committed. There is no such requirement for Sec. 15.03, supra. Thus, the two statutes do not prohibit the identical conduct. Section 15.03, supra, would be proper where the solicitation occurred but the murder itself was not committed. See *Hobbs v. State,* Tex.Cr.App., 548 S.W.2d 884.

■ In *Ex parte Jewel,* 535 S.W.2d 362, 364, we said:

"It is well established that 'the prosecuting attorney may carve as large an offense out of a single transaction as he can, but he must only cut once . . . .' 1 Branch's Ann.P.C., 2d Ed., Sec. 654, p. 625; *Fleming v. State,* 168 Tex.Cr.R. 595, 330 S.W.2d 457 (Tex.Cr.App.1959)."

Here the prosecutor chose to proceed under capital murder, which was the largest offense possible from the transaction involved. When the facts reflect that a murder was committed, and the other elements of the offense set forth in Sec. 19.03(a)(3), supra, are present, the State is fully within its rights to proceed under a capital murder indictment.[4] To adopt the appellant's theo-

\* \* \* \* \* \*
(3) the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration."

2. V.T.C.A. Penal Code, Sec. 15.03, provides, in pertinent part:
"(a) A person commits an offense if, with intent that a capital felony or felony of the first degree be committed, he requests, commands, or attempts to induce another to engage in specific conduct that, under the circumstances surrounding his conduct as the actor believes them to be, would constitute the felony or make the other a party to its commission."

ry would require prosecutions to be brought only under the least serious possible offense. This we decline to do.

Appellant next contends that the trial court abused its discretion by failing to grant his motion for new trial based on newly discovered evidence. The record reflects that on May 4, 1976, the appellant filed his "Amended Motion for New Trial" in which he set out his new evidence. Attached to the motion was the following sworn affidavit of Carol Ann Hart:

"My name is Carol Ann Hart and I reside at 1405 North 9th Street, Wichita Falls, Wichita County, Texas. On April 20, 1975, I talked to Zelma Strader and she stated to me that James David Brown had nothing to do with the death of his wife, Linda Faye Brown."

No hearing was ever held on this motion.

■ The trial court did not abuse its discretion by refusing to grant the motion. The appellant's "Amended Motion for New Trial" is not sworn to and thus does not present the error to us for review. In *Montgomery v. State,* 460 S.W.2d 419, we said:

"We first observe that the motion is not sworn to, for which reason alone it is not sufficient to present for review the claimed error in the overruling of the motion based on newly discovered evidence. *Browning v. State,* Tex.Cr.App., 432 S.W.2d 85; *Watkins v. State,* Tex.Cr.App., 438 S.W.2d 819; *Martin v. State,* Tex.Cr.App., 459 S.W.2d 845. Such rule is well established and *the attached affi-*

3. For a holding similar to appellant's theory, see *Jones v. State,* 552 S.W.2d 836, where we held it was improper to prosecute under V.T.C.A. Penal Code, Sec. 31.03(d)(4)(A) (Theft over $200) when the same actions were covered more specifically by Vernon's Ann.Civ.St., art. 695c, sec. 34 (Public Welfare Act).

4. See *Alejos v. State,* 555 S.W.2d 444 (Opinion on State's Motion for Rehearing), where we held that the State properly exercised its option to prosecute under V.T.C.A. Penal Code, Sec. 38.04 (Evading Arrest) instead of Vernon's Ann.Civ.St. art. 6701d, sec. 186 (fleeing or attempting to elude a police officer).

davit of the allegedly newly discovered witness alone will not suffice. *Martin v. State,* 169 Tex.Cr.R. 423, 334 S.W.2d 796; *Barnett v. State,* 160 Tex.Cr.R. 622, 273 S.W.2d 878." [Emphasis supplied.]

 Even if the issue was properly before us, no error would be shown. The evidence in Hart's affidavit serves only to impeach Strader. In *Ayala v. State,* 511 S.W.2d 284, 288, this Court said: "Affidavits containing mere impeachment testimony are not such newly discovered evidence as will require the granting of a new trial." No error is shown.

Lastly, appellant contends that the court erred in overruling his objection to the testimony of a police officer that he believed that appellant was "trying to act like he was unconscious."

Officer Cawyer of the Wichita Falls Police Department testified that he saw appellant when he arrived at the scene of the homicide, that appellant was seated, "slumped backwards and being supported," and that he was "kind of groaning, moaning and whimpering-type sounds." In response to a question as to what he "observed concerning his condition," the witness responded, "He was trying to act like he was unconscious in my opinion." Cawyer further testified that when he told appellant to open his eyes that "he [appellant] opened his eyes immediately." Objection was made to the testimony relative to appellant "trying to act like he was unconscious" for the reason that the witness was not qualified as a medical expert. The objection was overruled by the court.

We find the complained of statement to be a shorthand rendition of the facts. See *Silva v. State,* Tex.Cr.App., 546 S.W.2d 618 (that defendant and his brother had *ambushed* the declarant); *Dabbs v. State,* 507 S.W.2d 567 (the cigarette *appeared to be fresh*); *Ashley v. State,* Tex.Cr.App., 527 S.W.2d 302 ("I would say *she was very upset*"); *Gardner v. State,* Tex.Cr.App., 486 S.W.2d 805 (that mark on door had been caused by object having been "slid in the door between the door and the trim"); see also McCormick and Ray, Texas Practice,

Vol. 2, Evidence, 2d Ed., Sec. 1397. No error is shown.

The judgment is affirmed.