In The



Court of Appeals



Ninth District of Texas at Beaumont


 

____________________



NO. 09-01-481 CR


____________________



CHARLES LOREY FREDERICK, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 128th District Court


Orange County, Texas


Trial Court No. A-000322-R






O P I N I O N


 Charles Lorey Frederick was convicted of murder, and sentenced to 35 years in the
custody of the Texas Department of Criminal Justice -- Institutional Division. See Tex.
Pen. Code Ann. §§ 12.32(a), 19.02 (Vernon 2003). He raises three issues: 1) legal
sufficiency of the evidence to support his conviction; 2) ineffective assistance of counsel
at trial; and 3) abuse of discretion by the trial court in failing to grant his motion for new
trial. 

Legal Sufficiency

 Frederick contends the evidence is legally insufficient to establish beyond a
reasonable doubt that he intentionally caused the death of Steven Ray Fletcher. In
reviewing a claim of legal insufficiency, the appellate court must determine whether,
viewing the evidence in the light most favorable to the verdict, any rational trier of fact
could have found the essential elements of the offense charged beyond a reasonable doubt. 
Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed 2d 560 (1979). Intent
to kill may be inferred from the methods used, the use of a deadly weapon, and the
surrounding circumstances. Smith v. State, 56 S.W.3d 739, 745 (Tex. App.--Houston [14th
Dist.] 2001, pet. ref'd); Tidmore v. State, 976 S.W.2d 724, 728 (Tex. App.--Tyler 1998,
pet. ref'd); Kelley v. State, 968 S.W.2d 395, 399 (Tex. App.--Tyler 1998, no pet. h.). 

 Frederick claims he killed Fletcher in self-defense. The jury has the responsibility
of determining the weight to be given each witness's testimony, and may believe or
disbelieve any witness. Tidmore v. State, 976 S.W.2d at 730. The jury was instructed on
self-defense. See Tex. Pen. Code Ann. §§ 9.31, 9.32 (Vernon 2003). When a jury finds
the defendant guilty, there is an implicit finding against the defensive theory. Zuliani v.
State, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). 



State's Evidence

 About 2:55 a.m. on May 17, 2000, the Bridge City Police 9-1-1 dispatcher received
a call originating from 8008 Campbell Road in Mauriceville. The male caller, identifying
himself as "Chuck," said that he had shot his friend and roommate, "Fletch," thinking he
was a robber. Emergency and law enforcement personnel responded to the call at a trailer
at that location, and noticed clothing, as well as other items such as a microwave oven and
a television set, scattered on the deck and in the front yard. They found the deceased,
Steven Ray Fletcher, lying on the floor in the trailer. He had been shot. The bullet
entered the chest and exited the back, with about a two and one-half inches downward
deflection. Dr. Tommy Brown, a forensic pathologist, performed an autopsy on the
victim, and concluded that his death was caused by a gunshot wound to the chest that went
completely through the victim's body, and that the manner of death was homicide. 

 Frederick was inside the trailer when the law enforcement and emergency personnel
arrived. Paramedic Tim Romere testified that he overheard Frederick tell someone in the
room that he thought he shot a robber. Officers found a 30 - 30 rifle in close proximity
to the victim. Seven bullets, one spent cartridge and six live rounds, were found in the
weapon, which appeared to have been fired. A bullet was recovered from the doorframe
above the entrance. No signs of a struggle were observed. 

 Wanda Lynch, nicknamed "Squeaky," was Frederick's girlfriend. They lived in
Fletcher's trailer for about a month and a half prior to the shooting. Around noon on May
16, 2000, Frederick came home from work for lunch, and Fletcher and Lynch told him
they planned to run errands that day. After Frederick had gone back to work, Fletcher and
Lynch left the trailer, leaving Frederick a note of their plans. By 3:00 p.m., the errands
were finished and Fletcher and Lynch were drinking beer at a bar. During the next several
hours, they visited two other bars and consumed at least 12 beers a piece. Around 7:00
p.m., Lynch heard Fletcher's pager go off and she thought Fletcher called Frederick back. 
Fletcher told her that Frederick said she had an "ass whipping" coming. As the evening
progressed, she heard the beeper go off four more times, and finally Fletcher told her it
was time to go, and they got into his truck. Instead of taking her back to the trailer,
Fletcher took Lynch to his mother's house in Port Neches, telling Lynch he didn't want
her to get her "ass whipped." After dropping Lynch off, she heard Fletcher express
displeasure towards Frederick, and say that he was going home to take care of it. Lynch
went to sleep, but was awakened by Mrs. Fletcher. At her insistence, Lynch called
Frederick at 2:32 a.m. to tell him that Fletcher was coming home, that he was mad, and
that Frederick should get out of the trailer. Lynch testified that Frederick was familiar
with guns and kept a 30-30 rifle in his truck. Although denying it at trial, she told
investigators that she thought Frederick was jealous of Fletcher because he had a good job
and owned his own trailer. 

 Jeff Nelson, a co-worker of Fletcher's, encountered Fletcher at the bar around
11:30 p.m. Fletcher was with a female who was introduced as "Squeaky." He heard
Fletcher's pager go off, which seemed to irritate and frustrate both Fletcher and Squeaky. 
Fletcher and Squeaky walked away in the direction of the pay telephones. 

 Margaret Fletcher was awakened by a call from her son at 1:30 a.m. He told her
he was bringing a girl to the house. Her son and the girl, introduced as "Squeaky,"
arrived at the house around 2:15 a.m. Fletcher stayed no more than 15 minutes and
seemed upset; she heard him say as he left "no one tells me to get out of my trailer." 
After her son left she talked to Squeaky, who told her that Frederick had abused her, and
also that he kept a gun in his truck. At her insistence, Squeaky called Frederick at 2:32
a.m. She heard Squeaky tell Frederick that Fletcher was coming back but that she was
not, because she did not want to be abused anymore. About 3:15 a.m., Mrs. Fletcher got
a call from Frederick asking the whereabouts of Squeaky. In order to protect her, she told
him Squeaky was not there.

 Detective Michael Marion took three statements from Frederick. In Frederick's
first statement, taken at St. Elizabeth's Hospital, Frederick stated that when he came home
from work on the 16th, both Fletcher and Lynch were gone and he saw the note they had
left him. Lynch called him and they argued. Frederick told Marion he then removed the
gun from his truck, because he was going to go and look for them and didn't want the gun
in the truck. When Lynch called him back they argued again. She told him she wasn't
coming home and was staying in a motel. He threw her belongings out in front of the
trailer. He had been drinking and continued to drink. Finally he sat down in the chair,
and fell asleep with the gun in his hands. When he heard the door burst open, he shot at
what he thought was an intruder. Only when he turned on the lights did he realize it was
Fletcher, he told Morrison in his first statement. He then called 9-1-1. 

 The next morning, May 18, Frederick gave a written statement to Marion at the
Sheriff's Office. That statement generally agreed with his previous statement, in that he
still maintained he didn't know it was Fletcher when he fired the gun. He did tell Marion
that he had, during the evening, gone out with Donnie Simmons and smoked marijuana. 
He stated that he and Fletcher had fought in the past, and that Fletcher was pretty big and
could probably whip him.

 After being arrested, Frederick gave Marion another written statement. He stated
that after getting his gun from his truck, he sat in the recliner, smoked a cigarette and
drank a beer, with the gun across his lap. Although it was dark, he realized it was
Fletcher, and that Fletcher was coming after him. When Fletcher got about 4 to 6 feet
away, the gun went off. He stated he never meant for it to happen. 

Defense Witnesses


 James Donald Simmons was Frederick's drinking and marijuana smoking
companion on the evening of the 16th. On the evening in question, Frederick mentioned
to him that his girlfriend and Fletcher were running errands together. Frederick did not
appear agitated or aggravated.

 Frederick testified at trial that he and Fletcher had a very close relationship, beginning
in junior high school. When Frederick and Lynch had trouble with their landlord, Fletcher
invited them to live with him in his trailer. Frederick did not find that strange because he and
Fletcher were close. 

 On May 16, 2000, Frederick was employed working construction, 7:00 a.m. to 3:00
p.m. Fletcher was asleep when he left and he doesn't remember if Squeaky was awake. 
Since he worked only a few miles away, Frederick came home for lunch. Lynch and Fletcher
talked about running errands that day. Frederick testified he had no concerns about Lynch
spending the day with Fletcher. After lunch, Frederick returned to work, working until about
3:30 p.m . When he returned to the trailer, he found no one at home. He found a note which
indicated they had left about 2:00. He assumed that after running errands they would stop
and have a few beers. Frederick and a friend, Donny Simmons, decided to go down to the
river and drink beer. Frederick, Simmons and an unidentified third party spent about an hour
and a half at the river, drinking a 12-pack of beer, smoking a joint and shooting the breeze. 
Frederick then returned to the trailer. 

 No one was home. He decided to lie down for a while. He paged Fletcher about 7:00,
but got no answer. He went to sleep about 7:30 or 8:00 p.m.. He woke up around 11:30 or
midnight, and still no one was home. 

 Frederick knew he was pretty drunk. He testified that he wanted to go and meet them,
and paged Fletcher three or four times. After paging, he went out to his truck to get his rifle
because he didn't want any trouble with drinking, driving and guns. He brought the gun into
the trailer and leaned it against the corner by the recliner. He then sat down, drinking three
or four more beers while waiting. It was a "pretty good while" before Fletcher returned his
call and told him they were "getting tore up" and that they would be home in a little while. 
Frederick took for granted that Lynch would be coming back with Fletcher. Frederick
testified that Fletcher told him they were going to "play" when Fletcher got back. Fletcher
testified "play" referred to sexual activity between Fletcher and himself, along with other
"unusual" sexual activity with others, which had been on-going between them since they
lived in an apartment together, "whenever - - it just worked out." Frederick testified that on
one previous occasion, Fletcher had punched him and knocked him out in order to have sex
with him. 

 Lynch called him informing him that Fletcher was on his way home, and that she was
staying at a motel. In about twenty minutes, Fletcher arrived back at the trailer. Frederick
testified that Fletcher was insistent on engaging in sexual activity, and that Fletcher pushed
him down twice and was coming at him, that he grabbed the gun and it went off. Frederick
testified he did not intentionally pull the trigger, but that he did not want to take another
beating or sexual assault; he just wanted to get out. He testified that he grabbed the weapon
to defend himself. 

 After seeing the hole in Fletcher's chest, he called 9-1-1, and attempted to perform
CPR. He recalled being pulled out of the way by a police officer, who allowed him to go to
the sink and wash the blood off of his hands. He was experiencing chest pains and asked for
his nitroglycerin pills. After being told that Fletcher had died, he began shaking
uncontrollably. He remembered talking to Sgt. Marion, but he could not comprehend
anything because of his condition. He was unconscious at the hospital, and recalled speaking
to Sgt. Marion there, but didn't recall anything about the conversation. He testified that he
didn't tell Marion what had actually happened between him and Fletcher because he didn't
want to hurt Fletcher's reputation, that what had occurred between them was "pretty taboo
here in Southeast Texas." He testified he threw the belongings out in front attempting to talk
Fletcher out of his intended plans. Frederick admitted he lied on his earlier statements, but
claimed that his courtroom testimony was truthful. 


Sufficiency of the Evidence

 The first issue is whether there is legally sufficient evidence Frederick intended to kill
Fletcher. The jury was entitled to infer intent from the surrounding circumstances. Smith v.
State, 56 S.W.3d at 745. Although Frederick's "state of mind" during that evening was
disputed, there was sufficient evidence from which a jury could infer that he was jealous of
Fletcher's companionship with Wanda Lynch, and mad at Fletcher. He admitted he was
drunk. He testified that he was defending himself against a sexual assault. The jury could
choose to disbelieve his claimed lack of intent to kill. Frederick's numerous and
contradictory statements given to the police were such that a reasonable trier of fact could
disbelieve his latest version of the incident, which had Fletcher attempting to attack him.
There were no signs of a struggle. The jury reasonably could find that Frederick was warned
by Lynch's phone call that Fletcher was on his way back to the trailer, warned that Fletcher
was angry, and warned that Frederick should get out; the jury reasonably could infer that
Frederick had the opportunity to retreat and chose not to leave. See Tex. Pen. Code Ann.
§ 9.32(a)(2) (Vernon 2003) (deadly force in defense of person). The jury reasonably could
find that Frederick chose to arm himself, to sit and wait for Fletcher's arrival, and to fire the
weapon at him as he entered the trailer. Viewing the evidence in the light most favorable to
the verdict, a reasonable trier of fact could have found, beyond a reasonable doubt, that
Frederick intentionally caused the death of Steven Ray Fletcher by shooting him with a
firearm. The legal sufficiency issue is overruled.

Ineffective Assistance of Counsel

 Next, Frederick contends he was given ineffective assistance of counsel, due to trial
counsel's failure to request jury charges on recklessness, accident and criminal negligence. 
Trial counsel testified he thought he requested an accident instruction. The trial court file
contained no requested jury instruction on accident.

 Texas courts adhere to the two-pronged test announced in Strickland v. Washington,
466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed2d 674 (1984). It is appellant's burden to show that:
1) trial counsel's performance was deficient; and 2) there is a reasonable probability that, but
for counsel's deficient performance, the results of the proceeding would have been different.
Thompson v. State, 9 S.W.3d 808, 812-813 (Tex. Crim. App. 1999). Any particular
allegation of ineffectiveness must be firmly founded in the record, and the record must
affirmatively demonstrate the alleged ineffectiveness. Id. Failure to make the required
showing of either deficient performance or sufficient prejudice defeats the ineffectiveness
claim. Id. Appellant must overcome the presumption that, under the circumstances, the
challenged action might be considered sound trial strategy. Tong v. State, 25 S.W.3d 707,
712 (Tex. Crim. App. 2000). When examining an appellant's claim of ineffective assistance,
the reviewing court "must be highly deferential to trial counsel and avoid the deleterious
effects of hindsight." Thompson, 9 S.W.3d at 813. The reviewing court must engage in a
strong presumption that counsel's actions fell within the wide range of reasonable
professional assistance. Id. 

 Frederick has failed to demonstrate that trial counsel's performance in this regard was
deficient. He was not entitled to an instruction on accident. Accident is not a defense, but
rather is incorporated within Section 6.01(a) of the Penal Code, which provides that a person
commits an offense only if he voluntarily engages in conduct. Avila v. State, 954 S.W.2d
830, 838 (Tex. App.--El Paso 1997, pet. ref'd). "Voluntary" is the opposite of "accident." 
Id. (citing Alford v. State, 866 S.W.2d 619, 624 (Tex. Crim. App. 1993) and George v. State,
681 S.W.2d 43 (Tex. Crim. App. 1984)). And we note in two cases it has been held a
defendant's testimony that he acted in self-defense precluded an instruction on recklessness. 
See Avila v. State, 954 S.W.2d at 843; Mock v. State, 848 S.W.2d 215, 219 (Tex. App.--El
Paso 1992, pet. ref'd) ("One cannot accidentally or recklessly act in self-defense."). 
Frederick requested a submission on self-defense. His counsel may have concluded, given
the cited cases and for strategic reasons, not to assert what may have been viewed as
inconsistent theories of defense. Given this record, Frederick has failed to overcome the
strong presumption that counsel's actions fell within the wide range of reasonable
professional assistance. See Thompson, 95 S.W.3d at 813. This issue is overruled.

 

Motion for New Trial- - Newly Discovered Evidence.

 Frederick also contends the trial court abused its discretion in refusing to grant his
motion for new trial based on newly-discovered evidence. Defense counsel discovered that
several of the state's law enforcement witnesses had been guests of the family of the
deceased. During the period between the commission of the crime and the trial, deceased's
father invited law enforcement officers to hunt on his land, free of charge. Members of
deceased's family were observed eating with testifying officers during lunch breaks at the
trial. Deputy Smith testified at the motion for new trial that his friendship with Mr. Fletcher
began prior to the crime, and did not influence his trial testimony. The other officers did not
testify at the motion hearing. 

 The requirements for obtaining a new trial based upon a claim of newly-discovered
evidence are: 1) the newly-discovered evidence was unknown to movant at the time of the
trial; 2) movant's failure to discover the evidence was not due to his want of diligence; 3) the
evidence is probably true and its materiality is such as would probably bring about a different
result in another trial; and 4) the evidence is competent and admissible and not merely
cumulative, collateral, impeaching or corroborative. Etter v. State, 679 S.W.2d 511, 514
(Tex. Crim. App. 1984); Moreno v. State, 1 S.W.3d 846, 853 (Tex. App.--Corpus Christi 
1999, pet. ref'd). The evidence of the deputy sheriffs' contacts with the family of the
deceased prior to and during the trial may have been admissible for impeachment purposes, 
see e.g. Moreno v. State, 22 S.W.3d 482, 485 (Tex. Crim. App. 1999), but, generally, newly
discovered impeachment evidence is not sufficient for the granting of a new trial. Brown v.
State, 561 S.W.2d 484, 489 (Tex. Crim. App. 1978). No other arguments presented at the
motion for new trial hearing concerning newly discovered evidence are raised in appellant's
brief. This issue is overruled. 

 The judgment of the trial court is affirmed. 

 PER CURIAM


Submitted on April 7, 2003

Opinion Delivered July 30, 2003

Do not publish


Before McKeithen, C.J., Burgess, and Gaultney, JJ.