In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-17-00068-CR**
_____

**JOHN WESLEY SMITH, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 163rd District Court**
**Orange County, Texas**
**Trial Cause No. B160460-R**

**MEMORANDUM OPINION**

A grand jury indicted Appellant John Wesley Smith for the offense of injury to an elderly individual. *See* Tex. Penal Code Ann. 22.04 (West Supp. 2017)[1]. After a trial, a jury found Smith guilty and that Smith used a deadly weapon during commission of the offense. The jury assessed punishment at confinement for sixty-nine years and a fine of $10,000. On appeal, Smith raises two issues, challenging the

[1] We cite to the current version of the statute because subsequent amendments do not affect our disposition.

1

sufficiency of the evidence to support his conviction and alleging that he was denied the effective assistance of counsel. We affirm.

Background

On November 16, 2016, a grand jury indicted Smith for:

> . . . intentionally and knowingly engag[ing] in conduct that caused serious bodily injury to [W.S.][2], an individual who was at least 65 years of age by hitting the said [W.S.] on the head
>
> [and] . . . recklessly engag[ing] in conduct that caused serious bodily injury to [W.S.], an individual who was at least 65 years of age by hitting the said [W.S.] on the head.

Smith was tried for intentionally and knowingly causing serious bodily injury to an elderly person, to which Smith pleaded "not guilty."

Testimony of Marie Dempsey

Marie Dempsey, a communications supervisor for the Orange County Sheriff's Office, testified that she located a 911 phone call made on September 4, 2016 and made a copy of the recorded call. A copy of the recorded 911 call was admitted as State's Exhibit 1 and published to the jury.

---

[2] We use initials to refer to the victim. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

<u>Testimony of Deputy Chase Alexander</u>

Deputy Chase Alexander, a patrol officer with the Orange County Sheriff's Office, testified that he was working the night shift on September 4, 2016, and he received a call about a male suspect's mother who had "some facial injuries" and an ambulance was being dispatched to an address in Rose City to check on the victim who was the suspect's mother. Deputy Alexander explained that he and two other officers went to the home in Rose City, and when he looked through a window, he could see the back of an elderly white woman in a nightgown who was walking. According to Alexander, when the woman opened the door he could see her hair in disarray and her appearance was "unreal." Alexander explained that he thought she had "real injuries[]" and that he needed to get an ambulance. Alexander testified that the officers did not find anyone else in the house other than a small dog, and he was able to determine the woman, W.S., was about sixty-nine years of age. Alexander explained that W.S. "kept clenching a napkin in her hand and would dab her face to the spots that were bleeding," and "[i]t was like she was so beat []senseless she didn't know what was going on."

According to Deputy Alexander, upon a search of the house, the officers found napkins in the kitchen covered with blood, blood on the floor, blood on the bed, and blood on clothing. Alexander agreed that it appeared that an assault had taken place

just before the officers arrived. When Alexander asked W.S. who had done this to her, she responded "I guess my son did." Deputy Alexander agreed that State's Exhibits 2 through 18 fairly and accurately depicted W.S.'s residence and her injuries on September 4, 2016, and included pictures from numerous places inside the house where blood was visible, and included a photo of the inside of a purse.

Testimony of Dr. David Parkus

Dr. David Parkus, the director of trauma surgery at St. Elizabeth Hospital, testified that he examined W.S. on September 4, 2016, after other emergency room doctors found she had serious injuries. Describing W.S.'s appearance, Dr. Parkus explained

> I walked in and saw this frail elderly lady whose face looked like a pumpkin. It was just completely purple, swollen, eyes completely shut. It was -- it was pretty disturbing.
>
> . . . .
>
> I mean, the most severe and obvious injury was to her face. It was completely swollen and purple. There were also bruises that I observed around the neck and arms, and I believe there was some bruises on the anterior chest.

Parkus testified that, when W.S. arrived at the emergency room, he understood she had been assaulted; she had bruising about her face, a swollen nose, eyes swollen shut, and blood flowing from her nostrils; her nose was shattered; and a CT revealed W.S. had a subdural hematoma. Dr. Parkus agreed that State's Exhibits 19 through

4

24 were photographs that fairly and accurately depicted W.S. at the hospital and a couple of days after September 4, 2016. According to Dr. Parkus, the pattern of bruising—which included multiple discrete bruises of similar colors and bilateral ecchymosis (bruising of the eyes)—implied "multiple strikes or hits[]" that happened at the same time and also showed trauma to her neck. Parkus explained that W.S. had both a subarachnoid hemorrhage as well as contusions to the brain, which indicated "severe brain trauma." Parkus further explained that W.S.'s head injuries caused her to develop problems swallowing correctly and she was put on a feeding tube. In addition, Parkus testified that W.S. required plastic surgery on her nose so she could breathe because "her nose was completely collapsed, and the septum . . . was smashed in[.]"

In Dr. Parkus's opinion, W.S.'s injuries constituted serious bodily injury. As a trauma surgeon who has worked with individuals involved in boxing, martial arts, and mixed martial arts, Parkus agreed that Smith's hands could have been used as a deadly weapon to cause serious bodily injury to W.S.

Testimony of Sergeant David Lampman

Sergeant David Lampman with the criminal investigations division of the Orange County Sheriff's Office testified that on September 6, 2016, he was assigned to investigate the W.S. case and he became the lead investigator. Lampman

5

explained that he went to the hospital to check on W.S.'s condition and to get consent for photographs and access to medical records, but he was unable to speak with her because she was in an induced coma. The Sergeant agreed that State's Exhibits 19 through 26 were photographs he took that reflect how he found W.S. when he saw her in the hospital. According to Lampman, he played the recorded 911 for W.S.'s daughter, was able to obtain an identification of the caller's voice, and determined that Smith was the suspect.

Lampman explained that, upon visiting W.S.'s home, he noted blood drops and blood splatter in various rooms, including a large amount of blood on the floor in Smith's bedroom and a bloody nightgown. According to Lampman, he believed that the large amount of blood on the floor collected because "the victim was sitting in [a] chair for quite some time and dripped."

Sergeant Lampman testified that he obtained a warrant for Smith's arrest on September 7, 2016, and he started reaching out to family members to locate Smith. Lampman located Smith at a relative's house in Vidor, where officers arrested Smith and took him into custody. Lampman explained that at the jail, after informing Smith of his rights and obtaining a signed *Miranda* card, he interviewed Smith, and the interview was recorded. Lampman identified State's Exhibit 53 as a copy of the recorded interview of Smith that occurred on September 8, 2016, which was

6

published to the jury. According to Lampman, during the interview Smith said he was a "trained boxer[.]" Lampman also explained that there was dried blood on the clothing that Smith was wearing when he was arrested, as reflected in the photos admitted as State's Exhibits 48 through 51.

Testimony of Detective Lauren Kemp

Detective Sergeant Lauren Kemp with the Orange County Sheriff's Office testified that she saw Smith on September 8, 2016, and she observed an injury to his right index finger. Kemp explained that "it was a healed-over wound[]" that "looked to be a superficial scratch extending from -- approximately maybe an inch in length, extending from the cuticle area going up towards the . . . first knuckle."

Testimony of C.H.

Smith's younger sister C.H. testified that she saw W.S. on September 2, 2016, and she described W.S. as "fairly healthy[]" with no mobility problems, but that W.S. had some problems with arthritis, pain, and memory. On September 4, 2016, C.H. learned that W.S. was going to the hospital in a phone call from C.H.'s father. According to C.H., at the time of trial, W.S. was in a nursing home and remained bedridden and had a feeding tube. Although C.H. felt W.S. had memory problems before the incident, C.H. doubted whether W.S. had Alzheimer's.

Testimony of John Wesley Smith

Smith testified that W.S. is his mother and that over the recent few years, he had lived primarily with his parents. According to Smith, his mother was his best friend, he loves her very much, and he has had a great relationship with her his whole life. Smith explained that prior to September 4, 2016, his mother was in very good shape physically but not mentally—she had memory loss and was "[v]ery erratic, impulsive at times, quite confused very much of the time." Smith testified that W.S. would lose her purse multiple times a week and blame him and his father. When asked whether W.S. would become aggressive, Smith responded "Oh, yes. Very, very much so[,]" and that W.S. had begun cursing in a manner that Smith regarded as "totally uncharacteristic[.]" Smith agreed that Alzheimer's runs in his family and he thought W.S.'s symptoms of memory loss and erratic behavior were similar to his grandmother's symptoms, and his grandmother had Alzheimer's.

Smith explained that W.S. took both Soma and hydrocodone and that sometimes the combination "can cause violence." According to Smith, on the night of September 4, 2016, W.S. asked him to help her look for her purse and "she became more aggressive, and . . . she became very violent, and she was sweating and red faced, bulging eyes when -- like when -- she gets when she takes her medication or too much of her medication." When he was attempting to help W.S., he turned

8

around and saw her "running at [him] with a butcher knife . . . a chopping, big butcher knife, very sharp[,]" with a handle about ten to thirteen inches long. Smith testified that W.S. was running at him very fast and said, "I will stab you." According to Smith, as W.S. approached him, he grabbed her wrists, but he let go when he fell, and W.S. "took a swing" at him with the knife. Smith explained that as he and W.S. tussled over the knife, he grabbed W.S.'s throat and facial area to try to push her off of him. Smith testified that he was initially unable to push W.S. off of him because "[s]he's a strong lady[,]" but W.S. eventually dropped the knife at which time Smith was able to get up. Smith further explained that he received a deep cut on his finger because

> right before she dropped the knife, she had -- she had grabbed my right finger, my right index finger. She got it in her mouth when I was trying to push her off of me; and she bit down.
>
> . . . .
>
> She bit down on it very hard, as I -- as I stated before; and she would not let go. And I'm trying -- I'm looking for the knife and she has the knife in her hand still and I'm trying not to get stabbed. And I can't get out away from her because my hand -- my finger is in her -- her grasp in between her teeth, and I'm -- I'm fighting for my life.
>
> . . . .
>
> With -- with my left hand in a open-fist position, in a vertical position, not a closed fist, I struck her on top of the cranium one time.
>
> . . . .

9

I was asking her, begging "Let go of me, please. Drop the knife. Let go of my finger." She -- she would not do any one of the things I asked. And she -- I asked her, like I'm saying, time and time; and everything's going by so fast. I'd say over time of a minute, if that long; and she -- I'm asking her, begging her still. No, not that long. Not quite that long. Time was flashing by. It was going by fast.

And she wouldn't let go, as I asked her; and I'm looking for the knife. I see the knife still in her hand, in her right hand.

. . . .

I was forced to -- to do basically the only thing I could do, and that was to do what I had done before. So, I had to strike my mother on -- on top of the cranium again, about three -- three more times, three or four more times.

. . . .

. . . I'm not a guesstimating person, assuming person, in life. I -- I think she was -- released letting go of the knife then.

And then she grabbed at me with her -- which would have been her -- her left hand; and she dropped the knife then, right before she grabbed it. I assume. I -- I was finally able to be able to push her back and --

. . . .

I was trying to get up, and I -- she was up. I was able to get up and run. Run.

. . . .

I took the knife with me because I didn't want her stabbing me, getting a hold to it. Got it out of her sight.

Smith explained that, back in his own room, he bandaged his finger and could hear

W.S. asking him to look for her purse, and she talked him into helping her.

10

According to Smith, he tried to be a good son, but he "feared for [his] life." Smith testified that when W.S. found her purse, he left the room, but when he turned around, "she jumps out with an umbrella and also another knife." Smith explained that W.S. hit him with the umbrella and because she also had a knife, he put his hands in a "hitting, pushing position." After W.S. hit him, Smith struck W.S. on her upper head, eyes, and face and pushed her in order to stop her because she had a knife and she had already threatened him. Smith further explained that W.S. hit her head on a cabinet after he pushed her.

Smith testified that, at that point, he went to his room and locked the door. Smith believed that W.S. used something like a butter knife to unlock the door, and she came into his room with the knife. Smith explained that W.S. was blocking the door, he hoped he could jump over her to get away, but he slipped on something and went down "right at her." According to Smith, W.S. came forward, trying again to stab him, and he jumped out of the way. Smith explained that he spun W.S. around, and when W.S. had her back to Smith, he locked his arm around her neck and tried to get the knife out of her hand. According to Smith, he finally got the knife away from her. To make sure it would not occur again, he picked up the knife and ran out, but later returned to his room and saw W.S. lying on the floor.

11

Smith testified that he saw W.S. was bleeding profusely and her nose was "bad off." He was able to take care of her because she was no longer threatening him, and he tried to stop her nose from bleeding. He suggested she put on something else because there was blood on her clothing. Smith explained that W.S. was "swelling up rapidly" and he knew she needed more help than he could provide. Smith testified that he was afraid for his father to come home because his father carries a gun and he might think W.S. was assaulted, so Smith then left the premises and started walking from the house in Rose City towards Vidor. He called a friend to get a Suboxone for himself "for the next day" and then called his aunt to pick him up. After he smoked a cigarette, his third call was to 911 to get help for W.S. Smith explained that he refused to tell 911 who he was because he did not want to get in trouble or get his mother in trouble. According to Smith, he spent a couple of days "in the woods" at his aunt's house until the police picked him up. Smith explained that he did not mention knives in the recorded interview with the police because he did not want to get his mother in trouble. He also explained that he did not immediately turn himself in for fear of getting his mother in trouble.

Smith denied he was a trained boxer. Smith agreed that he thought knives were deadly weapons and that he felt it was necessary to use force against his mother to protect himself from getting killed. On cross-examination he agreed he

12

purposefully and intentionally hit his mother on the head and that he caused serious bodily injury to her. Smith testified that his palms contacted W.S. around her eyes, upper cheeks, and possibly her nose. Smith agreed that W.S. "had this coming" because of her actions towards him and that his conduct was justified because he had the right to defend himself. Smith also explained that on September 3, 2016, his mother took him to St. Elizabeth, his mother had his money in her hand, and he snatched the money away from her because she would not give it to him.

Sufficiency of the Evidence

In his first issue, Appellant argues that the evidence is legally insufficient to support his conviction for causing injury to an elderly individual because, although Appellant admitted he intentionally engaged in the conduct, the evidence does not establish that he caused the resulting injuries or that he had the requisite criminal intent. Appellant argues that the record is not clear what injuries resulted from W.S. being hit by Smith and that the doctor and investigating officers did not testify as to how W.S.'s fractured nose and facial injuries may have occurred. Appellant also argues that Smith testified that he loved his mother very much, she was a "great lady" and his "best friend[,]" thereby indicating he did not act to intentionally or knowingly cause her serious bodily injury.

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). "The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses." *Temple*, 390 S.W.3d at 360; *see also Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (citing *Esquivel v. State*, 506 S.W.2d 613 (Tex. Crim. App. 1974)); *Johnson v. State*, 673 S.W.2d 190, 196 (Tex. Crim. App. 1984) (citing *Ables v. State*, 519 S.W.2d 464, 465 (Tex. Crim. App. 1975); *Esquivel*, 506 S.W.2d at 615) ("[A] jury, sitting as the trier of facts, may accept or reject any or all of the testimony adduced."). We give full deference to the jury's responsibility to fairly resolve conflicts in the testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We may not substitute our judgment for that of the factfinder concerning the weight and credibility of the evidence. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). When faced with conflicting evidence, we presume the trier of fact resolved conflicts in favor of the prevailing party. *See Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).

14

Appellant was indicted for intentionally and knowingly causing serious bodily injury to W.S., an individual who was at least sixty-five years of age, by striking her on the head. Smith testified that he struck W.S. on her head multiple times. A person commits the offense of causing injury to an elderly individual if he intentionally, knowingly, recklessly, or with criminal negligence causes an elderly individual: "(1) serious bodily injury; (2) serious mental deficiency, impairment, or injury; or (3) bodily injury." Tex. Penal Code Ann. § 22.04(a). "'Elderly individual' means a person sixty-five years of age or older." *Id.* § 22.04(c)(2). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46) (West Supp. 2017). An offense under this section is punishable as a first-degree felony. *Id.* § 22.04(e).

On cross-examination, Smith agreed that he purposefully and intentionally hit his mother on the head and that he caused serious bodily injury to her. Although Smith testified that W.S. had fallen during their scuffle, he also testified that he pushed or shoved her. In addition, Dr. Parkus—a trauma surgeon with medical experience with boxing, martial arts, and mixed martial arts—testified that the pattern of bruising he observed on W.S. suggested she had received "multiple strikes or hits[]" at the same time and that a CT scan of W.S.'s brain revealed she had a

subdural hematoma, "basically blood around the brain[.]" The doctor also agreed that Smith's hands could have been used as a deadly weapon to cause serious bodily injury to W.S.

Based on the record before us and viewing the evidence in a light most favorable to the verdict, we conclude that the evidence is legally sufficient for a reasonable jury to conclude beyond a reasonable doubt that Smith intentionally and knowingly caused serious bodily injury to W.S., an individual at least sixty-five years of age. *See Jackson*, 443 U.S. at 318-19; *Temple*, 390 S.W.3d at 360. The jury, as judge of the facts and credibility of the evidence, could disbelieve all or part of Smith's testimony, including his defensive theory. *See Temple*, 390 S.W.3d at 360; *Sharp*, 707 S.W.2d at 614. We overrule Smith's first issue.

Effective Assistance of Counsel

In his second issue, Appellant argues that he did not receive the effective assistance of counsel at trial because his attorney did not object to the charge for failure to include the lesser-included offense of reckless injury or that his attorney failed to request such a jury instruction. According to Appellant, on this record there is a reasonable probability that a jury would have found that Smith acted recklessly in causing W.S. serious bodily injury because uncontroverted evidence shows that the injuries were inflicted during an altercation during which W.S. was wielding a

16

knife at Smith. Appellant argues that failure to object to the jury charge on this basis, or to request a lesser-included instruction, constituted deficient performance and that Appellant was prejudiced thereby because he was subject to a much higher penalty range. Appellant also notes that trial counsel's performance was deficient for not requesting an instruction on the lesser-included offense because the second paragraph of the indictment charged Smith with recklessly causing serious bodily injury to W.S.

To establish that he did not receive the effective assistance of counsel, Smith must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's error(s), the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). The party alleging ineffective assistance has the burden to develop facts and details necessary to support the claim. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). A party asserting an ineffective-assistance claim must overcome the "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *See Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing *Strickland*, 466 U.S. at 689). An appellant's failure to make either of the required showings of deficient performance or sufficient prejudice defeats the claim of ineffective

17

assistance. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003); *see also Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong.").

The right to the effective assistance of counsel ensures the right to "reasonably effective assistance[,]" and it does not require that counsel must be perfect or that the representation must be errorless. *See Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984). The appropriate context is the totality of the representation; counsel is not to be judged on isolated portions of his representation. *See Thompson*, 9 S.W.3d at 813; *Solis v. State*, 792 S.W.2d 95, 98 (Tex. Crim. App. 1990). Isolated failures to object to improper evidence or argument ordinarily do not constitute ineffective assistance of counsel. *See id.*; *Ewing v. State*, 549 S.W.2d 392, 395 (Tex. Crim. App. 1977). In order to meet his burden regarding his claim that his counsel was ineffective for failing to object to evidence, Appellant must also establish that the trial court would have committed error in overruling such objection had an objection been made. *See Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996). Ordinarily, on direct appeal, the record will not have been sufficiently developed during the trial regarding trial counsel's alleged errors to demonstrate in

the appeal that trial counsel provided ineffective assistance under the *Strickland* standards. *Menefield v. State*, 363 S.W.3d 591, 592-93 (Tex. Crim. App. 2012).

A two-step test determines whether a lesser-included offense instruction should be given to the jury. *Bullock v. State*, 509 S.W.3d 921, 924 (Tex. Crim. App. 2016); *Hall v. State*, 225 S.W.3d 524, 535-36 (Tex. Crim. App. 2007). First, the trial court must determine "whether the requested instruction pertains to an offense that is a lesser-included offense of the charged offense, which is a matter of law." *Bullock*, 509 S.W.3d at 924. Where the requested offense is established by proof of the same or less than all the facts required to establish the offense charged, the first step is satisfied. *See id.*; *see also* Tex. Code Crim. Proc. Ann. art. 37.09 (West 2006).

"The second step in the analysis asks whether there is evidence in the record that supports giving the instruction to the jury." *Bullock*, 509 S.W.3d at 924-25. Under this step, "a defendant is entitled to an instruction on a lesser-included offense when there is some evidence in the record that would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense." *Id.* at 925. "The evidence must establish that the lesser-included offense is a valid, rational alternative to the charged offense." *Id.* This step requires "examining all the evidence admitted at trial, not just the evidence presented by the defendant." *Id.* A defendant is entitled to the instruction on anything more than a scintilla of evidence,

but "it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense, but rather there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted." *Id.* When reviewing the trial court's ruling, we cannot consider "the credibility of the evidence and whether it conflicts with other evidence or is controverted." *Id.* Accordingly, "the standard may be satisfied if some evidence refutes or negates other evidence establishing the greater offense or if the evidence presented is subject to different interpretations." *Id.*

In the context of this case, the offense of injury to an elderly individual is a first-degree felony when the conduct is committed intentionally or knowingly and is a second-degree felony when committed recklessly. *See* Tex. Penal Code Ann. § 22.04(e).

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Tex. Penal Code Ann. § 6.03(c) (West 2011).

Here, Smith testified that he acted in self-defense, the defense argued that Smith acted in self-defense, and the jury charge included an instruction on self-

20

defense. As a matter of law, one cannot accidentally or recklessly act in self-defense. *See Martinez v. State*, 16 S.W.3d 845, 848 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd); *Avila v. State*, 954 S.W.2d 830, 843 (Tex. App.—El Paso 1997, pet. ref'd) ("His testimony that he acted in self-defense precludes an instruction on an accidental or reckless discharge of a weapon.") (citing *Mock v. State*, 848 S.W.2d 215, 219 (Tex. App.—El Paso 1992, pet. ref'd)). Additionally, Smith agreed he purposefully and intentionally hit his mother on the head and that he caused serious bodily injury to her.

On this record, we cannot say that the evidence establishes that the lesser-included offense was a valid, rational alternative to the charge the jury considered. *See Bullock*, 509 S.W.3d at 925. Therefore, Smith was not entitled to a charge on the lesser-included offense of recklessly causing serious bodily injury, and the trial court would not have committed error in refusing a request for such an instruction had such request been made. *See Vaughn*, 931 S.W.2d at 566. Accordingly, Smith has not met his burden. *See Strickland*, 466 U.S. at 687-88, 694. We overrule his second issue.

Having overruled Appellant's issues, we affirm the judgment of conviction.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on August 20, 2018
Opinion Delivered September 12, 2018
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.